## STATE v. MEWHINNEY.

No. 2389. Decided May 9, 1913. Rehearing denied July 3, 1913 (134 Pac. 632).

1. CRIMINAL LAW—PRELIMINARY EXAMINATION—ADVISING AS TO RIGHT TO ATTORNEY. The transcript of the proceedings before an examining magistrate, affirmatively showing that the defendant "waived the service of an attorney," shows that defendant was apprised of his right to such services. (Page 139.)

2. CRIMINAL LAW — PRESUMPTIONS — PERFORMANCE OF JUDICIAL DUTIES. In the absence of any showing to the contrary, it must be presumed that the examining magistrate performed the duty, imposed on him by statute, to warn one accused of crime of his right to the assistance of an attorney. (Page 139.)

3. CRIMINAL LAW—PRELIMINARY EXAMINATION—REDUCING TESTIMONY TO WRITING. Const. art. 1, sec. 13, provides that offenses heretofore required to be prosecuted by indictment shall be prosecuted by information after examination and commitment by a magistrate, unless the examination be waived by accused, with the consent of the state. Comp. Laws 1907, sec. 4670, which was in force before the adoption of the Constitution, provides that the testimony of each witness in cases of homicide must be reduced to writing as a deposition by the magistrate, or under his direction. *Held* that, where accused with the consent of the state waived the preliminary examination, he must be held to have waived the necessity of the magistrate's hearing any testimony as to the charge against him, so that there was no testimony to be heard or reduced to writing.[1] (Page 139.)

4. CRIMINAL LAW—APPEAL—REVIEW—DISCRETION OF TRIAL COURT—QUALIFICATION OF JUROR. Where it appears on error assigned to the refusal to sustain certain challenges for bias that the court might have found that the jurors challenged were fair,

[1] State v. Gustaldi, 41 Utah, 63, 123 Pac. 897.

impartial, and conscientious men, the trial court in its discretion was justified in overruling the challenges.[2]   (Page 141.)

5. JURY—MODE OF IMPANELING—PEREMPTORY CHALLENGES. Where 12 jurors were called and sworn on their *voir dire* and examined, and part of them excused for cause, and both the state and the defendant were required to exercise or waive their right to peremptorily challenge the jurors remaining in the jury box, leaving those not challenged to be sworn to try the case before any additional jurors should be called to take the place of those challenged and excused, the procedure was proper.[3]   (Page 141.)

6. CRIMINAL LAW—APPEAL—HARMLESS ERROR—RULING OF COURT. Where counsel on a murder trial was given every opportunity to bring all the facts before the jury, and the court in sustaining an objection to a statement by the prosecuting attorney that, of the articles coming into the possession of the chief of police, a cap was the most important, remarked that the assumption implied something that was not of record and not evidence in the case, error, if any, in such remark was not prejudicial.   (Page 144.)

7. CRIMINAL LAW—EVIDENCE—ARTICLES OF WEARING APPAREL.   In a prosecution for murder in the first degree, committed within and as a part of an attempted robbery, articles of wearing apparel and other articles found on or taken from defendant's accomplice after the attempted robbery were admissible.   (Page 145.)

8. CRIMINAL LAW—EVIDENCE—PRESUMPTION OF SANITY.   There is a legal presumption of sanity.   (Page 149.)

9. CRIMINAL LAW—CAPACITY TO COMMIT CRIME—GENERAL INSANITY —TEST.   Where the evidence to establish defendant's insanity could be considered only to show general insanity, the test of responsibility was the capacity of the defendant to distinguish between right and wrong at the time of and with respect to the criminal act.[4]   (Page 149.)

10. HOMICIDE—HOMICIDE IN COMMISSION OF ROBBERY—INSANITY— TEST.   Where defendant committed murder to avoid apprehension and conviction for an attempted robbery, and relied upon insanity as a defense, the test of mental responsibility was, not whether he was a confirmed thief and had not the will power to resist theft, but whether he had the mental capacity to distinguish between right and wrong with respect to the murder.   (Page 149.)

[2] State v. Thorne, 41 Utah, 414, 126 Pac. 286.
[3] State v. Riley, 41 Utah, 225, 126 Pac. 294.
[4] People v. Calton, 5 Utah, 458-460, 16 Pac. 902.

11. HOMICIDE—APPEAL—HARMLESS ERROR—INSTRUCTIONS. On a trial for murder, defended on the ground of insanity, where the evidence could be considered only to show general insanity, and the court properly defined the test thereof, its failure to enlarge upon different phases of insanity and mental weakness was not prejudicial to defendant. (Page 151.)

12. HOMICIDE—VERDICT—POWER OF JURY—DEGREE. A jury in any homicide case has the power, though not the legal or moral right, to disregard the evidence, and find one, who is clearly guilty of first degree murder, guilty of manslaughter, or acquit him. (Page 151.)

13. HOMICIDE—INSTRUCTIONS—SECOND DEGREE—STATUTES. On a trial for murder, under an information framed upon the theory of a deliberate and premeditated murder, and under the statute providing that murder committed in an attempt to commit robbery is murder in the first degree without deliberation or premeditation, where the evidence required a finding that the murder was committed in an attempt to rob, and the court submitted the case upon each theory of the information, there was no error in refusing to charge as to second degree murder; since the statute defined the crime shown by the evidence to be first degree murder, and the court was not required to charge on second degree murder so as to empower the jury to disregard the evidence and return a verdict contrary to law.[5] (Page 151.)

14. HOMICIDE—INSTRUCTIONS—SECOND DEGREE MURDER. In such case, the court might have submitted the question of second degree murder without committing error against accused. (Page 151.)

15. CRIMINAL LAW—INSTRUCTIONS—APPLICATION TO FACTS—ABANDONMENT OF INTENTION TO KILL. On a trial for murder in the first degree, on the theory of its commission during an attempt to rob, where there was no evidence that defendant had voluntarily abandoned the attempted robbery before firing the fatal shot, an instruction that, if defendant had abandoned the intention to rob before he shot deceased, the killing would not have been in an attempt to rob, and unless willful and premeditated, the killing would not have been murder in the first degree, was properly refused. (Page 155.)

16. CRIMINAL LAW—PRESUMPTION—"GOOD" OR "AVERAGE" CHARACTER—INSTRUCTIONS—PREJUDICE. In an instruction, that when a person is charged with the commission of a crime the law presumes that he is a man of "average" character and that the failure to call witnesses to prove his general good character

[5] State v. Thorne, 41 Utah, 414, 126 Pac. 286.

raises no presumption against it, the use of the word "average" in place of the usual adjective "good" was not prejudicial. (Page 155.)

17. CRIMINAL LAW—INSTRUCTIONS—RECOMMENDATION AS TO PUNISHMENT. In a trial for murder in the first degree, where the court, after calling attention to the statute enabling the jury to recommend life imprisonment in case they found defendant guilty of that degree of homicide, charged that in considering the question they were not restricted by any rule of law or public policy, but were entitled to decide the question from such considerations as might appeal to them, as reasonably entitled to be weighed in determining such recommendation, was not objectionable as in any way directing or controlling, or attempting to control or direct, the judgment of the jury on the question of recommendation.[6]  (Page 156.)

STRAUP, J., dissenting.

APPEAL from District Court, Third District; *Hon. F. C. Loofbourow,* Judge.

Harley Mewhinney was convicted of murder in the first degree. He appeals.

AFFIRMED.

*S. P. Armstrong* and *H. J. Brothers* for appellant.

*A. R. Barnes,* Attorney General, and *E. V. Higgins* and *George C. Buckle,* Assistant Attorneys General for the State.

FRICK, J.

Appellant was charged with, and, upon a trial by a jury in the district court of Salt Lake county, convicted of, murder in the first degree. The court, in due time, entered judgment sentencing appellant to suffer death. He appeals from that judgment.

---

[6] State v. Thorne, 39 Utah, 208, 117 Pac. 58.

Numerous errors are assigned. Before proceeding to a consideration of the assignments relating to the alleged errors occurring at the trial, we shall dispose of those which relate to the quashing of the information and the impaneling of the jury.

Counsel for appellant at the proper time interposed a motion to quash the information filed in the district court against him upon the grounds:

(1) That the magistrate before whom the original complaint was filed, and before whom appellant was taken after his arrest, did not inform or advise him "of his rights to the aid of counsel;" and (2) because "the testimony of the, or any of the, witnesses against him was not reduced to writing by the magistrate." The first ground is clearly untenable. The transcript of the proceedings before the magistrate affirmatively shows that the appellant "waived the service of an attorney." If this means anything, it means that appellant was apprised of his right to have such services.

In the absence of any showing to the contrary, we must presume that the magistrate performed the duties imposed upon him by our statute. Such is the holding of the courts. .(*People v. Figueroa,* 134 Cal. 159, 66 Pac. 202.) In the case at bar, as we have pointed out, it, however, affirmatively appears that appellant waived any aid or assistance from counsel.

Referring, now, to the second ground of the motion, it is true that Comp. Laws 1907, section 4670, in terms provides that "the testimony of each witness in cases of homicide must be reduced to writing as a deposition, by the magistrate, or under his direction." This section in substantially the same form was in force long before Utah became a state. 2 Comp. Laws 1888, section 4883. It was carried into the Revised Statutes of 1898 as section 4670 of that revision and is now known by the same number in Comp. Laws 1907, *supra.* Since said section was originally passed the Constitution of this state was adopted where, in article 1, section 13, it, among other things, is provided:

"Offenses heretofore required to be prosecuted by indictment, shall be prosecuted by information after examination and commitment by a magistrate, unless the examination be waived by the accused with the consent of the state, or by indictment with, or without such examination and commitment."

Although the language of section 4670, *supra,* is positive and without exception that in homicide cases the testimony of the witnesses must be reduced to writing, yet, in view of the constitutional provision that the accused with the consent of the state may waive the examination the statute cannot be given application according to the strict letter thereof. If the accused or the officer representing the state desires an examination to be held, then of course witnesses must be heard, and if they are heard their testimony must be reduced to writing as required by the statute. If, however, no examination is desired and is expressly or by implication waived, as held by us in *State v. Gustaldi,* 41 Utah, 63, 123 Pac. 897, then there is no need of hearing any testimony, and hence there is none to be reduced to writing. In the case at bar the transcript of the proceedings had before the committing magistrate affirmatively shows that appellant, with the consent of the state, expressly waived the preliminary examination mentioned in the Constitution. This he could do, and, having done so, he likewise must be held to have waived the necessity of the magistrate to hear any testimony with respect to the charge filed against him. There was therefore no testimony to be reduced to writing. Nor can there be any doubt as to appellant's competency to waive the examination, nor as to having done so, since he does not assail the truth of the statements to that effect contained in the magistrate's transcript, as he could have done under the ruling of this court in *State v. Gustaldi, supra.* See, also, upon this point, *State v. Ritty,* 23 Ohio St. 562. The motion to quash, for the reasons aforesaid, was therefore properly overruled.

It is also insisted that the court erred in refusing to sustain certain challenges for cause that were interposed by ap-

pellant's counsel against at least four prospective jurors upon the ground of both expressed and implied bias. It is accordingly urged that appellant was required to remove those jurors from the panel by the exercise of four peremptory challenges, which reduced by that number the quota of such challenges vouchsafed to him by our statute. We have carefully examined all of the testimony of those jurors given upon their *voir dire,* and we are satisfied that this case falls squarely within the rule laid down by this court upon this question in the recent case of *State v. Thorne,* 41 Utah, 414, 126 Pac. 286. The only difference between this and the Thorne Case is that, while there might have been some doubt in our minds with respect to the qualifications of some of the challenged jurors in the Thorne Case, there is no such doubt in this case. If there were, however, the rulings of the trial court fall squarely within what is said in the Thorne Case, *supra.* Further, by carefully going over the jurors' examination, we are impressed with the fact that they were fair, impartial, and conscientious men, and the trial court was clearly justified in overruling the challenges. This contention, therefore, cannot be sustained.

It is further contended that the court erred in requiring appellant to exercise his peremptory challenges at times when the jury box was not filled with jurors. The jury was impaneled and the challenges were required to be exercised in the manner stated by Mr. Justice McCarty in *State v. Riley,* 41 Utah, 225, 126 Pac. 294. We there held that the course of procedure followed in that case was proper. This case is therefore controlled by that one, and this assignment must also fail.

Passing to a consideration of the assignments relating to the alleged errors occurring at the trial, it becomes necessary to state as briefly as possible the controlling facts. From the evidence it is made to appear that the homicide in question occurred while appellant and an accomplice were engaged in the perpetration of or attempt to perpetrate a robbery. The undisputed facts relating to the homicide are substan-

tially as follows:    On the afternoon of the 6th day of October, 1911, between three and four o'clock, a Mrs. Fuller, after meeting one Sol. S. Brown, a friend of hers, on the street in Salt Lake City, went with him to her room on the second floor of the Romona rooming house, which is located on the cornor of Second East and Second South streets in said city.    Mr. Brown wore a large and conspicuous diamond ring on one of his fingers of the approximate value of $350.    In going upstairs to the room Mrs. Fuller noticed the appellant and his accomplice in the hallway.    Within a few minutes after Mrs. Fuller and Mr. Brown had entered the room aforesaid, there was a knock at the door, and Mrs. Fuller went to open it.    Upon opening the door she saw two men in the hallway (one of them the appellant) with handkerchiefs tied over the lower portions of their faces.    As soon as she had opened the door, they forced their way into the room.    One of the men had a revolver in his hand and immediately upon entering the room pointed it at Mr. Brown, and the other remained standing at the door, which he had closed after him.    Mr. Brown at once went forward and grappled with the one having the revolver, catching his hand or forearm in such a manner as prevented him from shooting Mr. Brown, and a hard struggle ensued between them.    Mr. Brown seemed to hold his own, and the man with the revolver, seemingly, could make no headway in obtaining the coveted prize, the ring.    He called to his accomplice, who still stood guarding the door, for help, and said, "Pull the ring off his finger."    The accomplice immediately left the door and went to the assistance of the other and in doing so struck Mr. Brown several times on the head with what is termed a "black-jack," inflicting scalp wounds which subsequently bled somewhat freely.    The struggle now went on between the three, but as soon as the one had left the door Mrs. Fuller ran out of the room, down the hallway, and into the street crying for help as she went.    Considerable uproar was thus caused, and it was not long before the man who had stood by the door also slipped out of the room, Mr. Brown and the other still continuing the

struggle for supremacy, while Mr. Brown was also crying
for help. Immediately after the one with the black-jack had
left the room Mr. Brown heard the steps of a man in the
hallway approaching the door which was now standing ajar.
The one with the revolver, who was still continuing the
struggle and still trying to obtain the diamond ring, appar-
ently also heard the steps of the approaching stranger, whose
name it was afterwards learned was Erickson, and he then
also broke away from Mr. Brown, who was becoming quite
weak from the blows he had received on his head and the
continued struggle, and ran out of the door into the hallway
which led downstairs into the street. Immediately after
getting outside of the door of the room in which the struggle
took place, the one with the revolver was met by Mr. Erick-
son, who was coming to Brown's assistance, and as soon as
he saw Mr. Erickson, and within a very few feet from the
door, he raised his revolver and shot Mr. Erickson, the bul-
let penetrating his chest and passing through a portion of
the heart. Mr. Erickson staggered back into a room near
by and fell on the floor and in a few minutes thereafter
expired from the effects of the bullet wound. Both of
Brown's assailants had in the meantime run down the steps
and had reached the street, where they separated. It was
only a few minutes afterwards, however, when the one who
had the revolver and who shot Erickson was apprehended
on the street in front of the rooming house while in the act
of inducing an expressman, whose express wagon he had
climbed onto, to drive him hurriedly away from the place.
He was immediately taken to the police station after he was
apprehended as aforesaid. A short time after the arrest he
was identified as the one with the revolver by both Mrs.
Fuller and Mr. Brown, and was further identified as the
one who did the shooting and as being the appellant in this
case. The other one was apprehended later on the same day
and was also identified by Mrs. Fuller and Mr. Brown as
the one who was with appellant and the one
who struck Mr. Brown with the black-jack. Dur-
ing the struggle in the room the handkerchiefs were torn

from the faces of the two men, and a full view of their features was thus obtained by both Mrs. Fuller and Mr. Brown. There is much other evidence respecting the identity of appellant and his accomplice which we need not refer to here. It must suffice to say that under the evidence no other conclusion is permissible than the one arrived at by the jury, namely, that the appellant is the one who had the revolver and who killed Mr. Erickson, and that the killing was done within and as a part of the *res gestae* of the attempted robbery.

It is contended that the court erred in one of its rulings which it is said trenched upon the province of the jury with respect to an important fact in the case. The matter arose during the progress of the trial and while counsel for appellant was cross-examining the chief of police, who was one of the state's witnesses. The witness had testified that at the time the appellant and his accomplice were brought to the police station some articles, including a cap, came into his possession, which it was shown were either taken from appellant's person when he was brought to the station or identified at the time as having been in his or his accomplice's possession at the time of the attempted robbery, or immediately thereafter. Appellant's counsel, Mr. Armstrong, on cross-examination, questioned the witness with regard to the articles aforesaid, and Mr. Farnsworth, the prosecuting attorney, interposed an objection to the method pursued by counsel. The record of the proceeding in this respect reads as follows:

"Q. So that you were not very careful in designating these different articles, about how they came into your possession? A. I was reasonably careful, as you see by the tags. Q. The important one, however, does not seem to be very well designated? A. Which is the important one? Q. The cap. Mr. Farnsworth: We object to counsel making any such assumption as that. The Court: The objection is sustained. It implies something that is not of record, not evidence in the case. Mr. Armstrong: Exception."

The contention that in sustaining the foregoing objection, and in making the remark, the court invaded the province of the jury, seems to us untenable. In view that the record discloses that counsel were given every opportunity to lay all the facts before the jury, the matter seems somewhat trivial. While the objection was extremely technical, yet the supposed question to which the objection was sustained was, in its nature, an assumption of a fact by counsel rather than a question to the witness which he was expected to answer. It is very clear that no prejudicial error resulted or could result from the court's ruling, and this assignment must therefore be overruled.

The contention that the court erred in admitting in evidence the articles of wearing apparel and other articles found on or taken from appellant's accomplice after the attempted robbery is clearly without merit. Wharton, Crim. Ev. (10th Ed.) section 312, p. 610.                               **7**

Counsel for appellant strenuously insist that the court erred in charging the jury upon the question of insanity. It may be said that appellant produced some evidence in support of his plea of insanity. It was contended at the trial, and is now insisted, that appellant had acquired the habit of using drugs, such as opium and morphine, and that their use affected his mental capacity. To establish that fact he produced in evidence the depositions of two witnesses of Terre Haute, Ind., one of whom testified that he was acquainted with appellant from 1900 to 1907 and that during that period of time appellant habitually used "both opium and morphine." When asked what effect the use of those drugs had upon appellant's mental condition as observed by the witness, he said:

"The use of drugs seemed to make him very thin and at times dull and stupid."

When pressed for further particulars with regard to the effect that the use of drugs had upon appellant's mind, the witness said:

"I am not aware of any specific facts and circumstances."

43 Utah—10

The testimony of the other witness is substantially the same; the only difference being that the other one said that appellant used the drug for a period of about five years between 1900 and 1907. After the year 1907 the witnesses did not come in contact with appellant. Upon substantially the foregoing testimony the two witnesses were permitted to give their opinion with respect to the sanity of appellant, and they both testified that in their opinion appellant was insane, and that the insanity was caused through the use of drugs as aforesaid. It also was shown that when appellant was arrested he had some morphine on his person, and that he afterwards called for some, and that the city physician ordered the officers to permit him to have about two grains daily for some time after his arrest. In addition to the foregoing testimony respecting appellant's insanity and the use of drugs, a young doctor who had about three years' experience in the general practice as a physician, and without any further experience, was called as an expert upon the question of insanity. His conclusions regarding appellant's mental condition were mainly based upon the effect that the habitual use of opium or morphine usually has upon the mind. The doctor, however, did not testify from actual experience, as his answers to the following questions clearly indicate:

"Q. And of these alkaloids you say that morphine is the most active and the most detrimental to the faculties of the mind? A. I have read authorities stating that fact. Q. You don't state that of your own knowledge as a chemist or anything? A. No, sir; I could not do that. Q. Not from your own practical experience, but from your reading of it? A. Yes, sir."

Upon substantially the foregoing testimony the doctor was permitted to answer a hypothetical question which was propounded to him by appellant's counsel, in which the facts as testified to by the witnesses aforesaid, together with the effect that the use of drugs had on the mind and appellant's habits with regard to their use as disclosed by the evidence, and further that the robbery was attempted in broad day-

light in a well-tenanted apartment or rooming house, and a few other unimportant facts, were recited. The doctor in answering the question said that in 'his opinion appellant was insane when he attempted to commit the robbery and when he shot and killed the deceased, Erickson. Upon the part of the state there was abundant testimony to the effect that appellant's conduct and demeanor immediately after the shooting and since then were always normal and rational. A physician who had frequently observed him after the shooting also testified that he did not use morphine in excessive quantities, and did not have the appearance of one who did so, and that in his judgment appellant at the time of the commission of the offense was and ever since has been sane. Upon the question of insanity the court instructed the jury that, before they could find appellant guilty as charged in the information, they "must be satisfied beyond a reasonable doubt from all the evidence in the case that the defendant at the time of the perpetration of, or attempt to perpetrate, such robbery or burglary, had formed the intent to commit such robbery or burglary, and that he had the mental capacity to distinguish between right and wrong with reference to said robbery or burglary; and, if you should find from the evidence in this case that the defendant at the time in question had not the mental capacity to form an intent to perpetrate a robbery or burglary, then you cannot convict him of murder in the first degree." The court further instructed the jury upon this question that: "The test of responsibility for a criminal act, when insanity is relied upon as a defense, is the capacity of the defendant to distinguish between right and wrong at the time of and with respect to the act which is the subject of inquiry; and, if after a fair and conscientious consideration of all the facts and circumstances in evidence you are not satisfied beyond a reasonable doubt that the defendant had the capacity to distinguish between right and wrong at the time of and with reference to the act in question, then you cannot convict him." The same thought in other forms was repeated in several of the instructions.

It is insisted that the capacity to distinguish between
right and wrong with respect to the criminal act in issue
is not the true test of mental responsibility. It is con-
tended that, in addition to that test, the jury should also
be told that they must find that the accused had the will
power to overcome or resist the impulse to commit the act
with which he stands charged. Let us assume at the outset
that, under certain circumstances where a plea of insanity
is interposed as a defense, it may become necessary to charge
the jury as contended for by counsel, and that in all cases
where such a plea is interposed it would be unobjectionable
although not necessary to do so. And let us assume further
that in this case it would not have been at all improper
for the court in its charge to have gone farther into the
question of insanity along the lines suggested by counsel.
The foregoing assumptions are, however, not decisive of the
question we are called upon to determine. In reviewing a
charge upon any particular subject, as well as in review-
ing the requests refused, we must constantly keep in mind
the facts and circumstances of the particular case as they
are made to appear from the evidence. What meager evi-
dence of insanity there is in this case is limited entirely
to generalities. The whole superstructure of the so-called
insanity claim is built upon the statements of two laymen,
who, for some years prior to 1907 (three years before the
murder in question was committed), were acquainted with
the appellant, and who testified that during that time—
that is, during the time they knew him—he was addicted
to the use of morphine and that the use thereof "at times
made him dull and stupid." Basing their opinions upon
these meager facts, the two laymen tell us that the appellant
was insane. In addition to their opinions, we also have a
young doctor, who, after having the foregoing evidence de-
tailed to him, also is willing to venture the opinion that the
appellant was insane. There is absolutely no evidence of
any actual mental lesions or any mental disease of any
kind or of any hallucinations or other mental derangement.

All that we have here, therefore, to establish insanity and to overcome the legal presumption of sanity, are a few general guesses based upon a few isolated facts which in and of themselves do not necessarily point to either insanity or to any serious mental derangement.

If the evidence in this case, therefore, is considered for the purpose of raising a doubt of the sanity of appellant, it can be considered for no other purpose except to show what may be called simple or general insanity. The existence of mental lesion, disease, or other aberration cannot be assumed or inferred, because there is absolutely no evidence to support such an inference. Under such circumstances, the test of responsibility that is applied by the overwhelming weight of authority is substantially the one given by the district court in this case in its charge to the jury. That test is thoroughly discussed by the authors of the following works: 1 Wharton, Crim. Law (10th Ed.) sections 50-55; Wharton on Homicide (3d Ed.) sections 537, 539; 1 Wharton & S. Med. Jur. section 175, and cases there cited. See, also, *People v. Calton,* 5 Utah, 458-460, 16 Pac. 902; 3 Thompson on Trials (2d Ed.) sections 536-541, where the test is approved.

We need not pause here to go over the reasons why the test is deemed a proper and a practical one except in those cases where the evidence discloses some special mental weakness, disease, delusion, or aberration. That the test in a case like the one presented by this record is the proper one impresses us as clearly sound, and this impression is not weakened after considering counsel's argument advanced in behalf of their contention. They, in effect, argue that if appellant was controlled by an irresistible impulse to commit the robbery—that is, if he did not have the will power to resist the temptation or impulse to rob or steal—then he should be acquitted, although he possessed the mental capacity to distinguish between right and wrong with respect to the homicide. This, in our judgment, is neither good law nor good sense. Suppose A. is charged with the murder of B., which is committed because

he is detected by B. while he was in the act of committing a robbery or larceny. Upon being tried for the murder, A., however, establishes by indubitable proof that for a long time prior to the commission of the larceny he was a confirmed kleptomaniac; that is, that he was afflicted with that species of insanity which manifests itself in an irresistible impulse or desire to steal, and that he lacked the will power to control or overcome the impulse. Would this proof be sufficient to excuse the homicide? We think not. In the assumed case A. committed murder for precisely the same reason that appellant killed Erickson, namely, to avoid apprehension and possible conviction for the attempted robbery. Under such circumstances, the test of mental responsibility, therefore, is not whether the accused is a confirmed thief and has not the will power to resist theft, but it is whether he had the mental capacity to distinguish between right and wrong with respect to the act with which he is charged, in this case murder. According to counsel's theory, although the accused may have had ample mental capacity to realize that it was wrong to kill, yet, if he was afflicted with an irresistible impulse to steal, he ought to have been acquitted of both crimes. This, in effect, would be an inducement to every thief to slay every one who discovered a theft committed by him.

There is nothing in the evidence in this case which would have justified the jury in finding that appellant was afflicted with any mental lesion, disease, or weakness, and hence it was not necessary to go into those matters in the charge in charging upon the general subject of insanity. To hold, therefore, that the court should have charged as contended by counsel, and that the refusal of the court to do so constitutes prejudicial error, is to disregard the evidence and the reasons which require such a charge, and further requires us to assume facts and conditions not directly testified to by any one nor legitimately deducible from any facts and circumstances that were testified to. The court, in our judgment, in submitting the question of general insanity

to the jury, clearly safeguarded all of appellant's rights in that regard.

We repeat that the question here is not the abstract one whether the court could not have properly enlarged upon the different phases of insanity or mental weakness, but the question we have to meet is whether the evidence required the court to so enlarge upon those subjects, and whether in having failed to do so the appellant was prejudiced. We are clearly of the opinion that the appellant was not prejudiced, and that the judgment, therefore, should not be reversed upon this ground.

When the cases cited by counsel upon this question are analyzed, it will be found that in all of them there were some facts and circumstances which made the doctrine contended for by them applicable to some extent at least. It must be conceded, however, that there are a few cases which seem to hold that the doctrine is applicable upon a mere general claim of insanity as was the case in the case at bar. We cannot yield assent to such a doctrine.

It is further insisted that the court erred in refusing to charge the jury with respect to second degree murder. This question, like the one of insanity, must of necessity, to a large extent at least, be controlled by our statute when considered in connection with the evidence adduced at the trial. In this connection it is contended that inasmuch as the information was framed upon the theory of a deliberate and premeditated murder and in view that the court submitted the case to the jury upon that theory as well as upon the statute which provides that murder "committed in the perpetration of or attempt to perpetrate robbery" also constitutes murder in the first degree without deliberation or premeditation, therefore the court should also have submitted the question of second degree murder to the jury. It is true that the court submitted the elements of deliberation and premeditation to the jury. From that it does not follow, however, as contended, that the court should also have submitted the question of an unpremeditated or second degree murder to the jury. Where

there was some evidence in this case from which the jury could have found a deliberate and premeditated murder, yet the jury would not have been justified in finding that the murder in question was not committed in an attempt to perpetrate a robbery, and upon the latter question there is not even room for doubt or conflict. Under our statute a murder so committed constitutes murder in the first degree and legally can constitute nothing else. True, a jury in any homicide case has the power to disregard the evidence and may find one who is clearly guilty of first degree murder guilty of manslaughter or acquit him.

From this it is assumed that, because a jury may do this, therefore a court must submit all the degrees of murder, and thus give the jury the right to pass upon the several degrees of murder. This contention loses sight of the legal principle involved in the statute just referred to which does not segregate murder committed in the perpetration of or attempt to perpetrate a robbery into degrees. While it is true that under our jurisprudence a jury has the power, with or without reason, either to reduce the degree of the crime, if it be divided into degrees, or acquit the accused, it does not follow that a court is bound in effect to charge that they may disregard the law, the evidence, and their oath in arriving at a verdict. Neither is it correct to say that, by not submitting the question of second degree murder in a case where the killing was perpetrated in an attempt to rob, the court thereby in effect coerces the jury to find the accused guilty of murder in the higher degree. Whether such might be the effect under our statute depends upon the evidence. If the evidence justifies a finding that the murder was committed in the perpetration of or attempt to perpetrate a robbery, it is the duty of the court to charge that, if they find beyond a reasonable doubt that the murder was "committed in the perpetration of or attempt to perpetrate a robbery," they should find the accused guilty of first degree murder, and if the evidence, as in the case at bar, does not justify the jury under their oaths to find otherwise, the court need not submit the ques-

tion of second degree murder at all, although it might do so without committing error against the accused. In such a case, in merely charging on first degree murder the court does not, as is contended, withhold anything from the jury, but simply charges the law. It is the law that fixes the degree of the offense, and when the facts are not in dispute and clearly show that the murder in question was committed as aforesaid, the jury have neither the legal nor a moral right to refuse to follow the law and in refusing to do so in effect amend or repeal the statute.

Of course, if the jury refuses to be bound by either law or fact, a court is powerless, but the court is not required to partake of the wrong and in effect suggest to the jury that they may do what the law does not sanction. Here again the question is not whether it would have been improper for the court to have charged with regard to murder in the second degree, but the question is whether under all the facts and circumstances of this case (not some other case) the trial court committed prejudicial error in refusing to so charge. Upon this question we are of the opinion that there was absolutely no evidence either direct or inferential which would have justified a finding by the jury other than that the murder in question was committed in an attempt to perpetrate a robbery. If this be correct, why submit a question to the jury upon which an affirmative finding can in no event be justified? Is not the question of whether there is any evidence in support of any essential fact as much a question of law in a homicide case as any other? Must the court in advance abdicate its prerogatives to the jury simply because that jury has the power, and perhaps the inclination, to disregard both law and fact? In this case the jury, however, followed the law, and in passing upon the facts observed their oath, and hence fully discharged their duty. Further, the case was fairly and impartially tried. What plausible reason, therefore, can an appellate court give for interfering with the verdict and judgment? Again, this case in principle is not distinguishable from *State v. Thorne, supra,* in which we held that

under a similar state of facts the court committed no error in refusing to charge on second degree murder.

In passing this point we desire to say that a trial court should, in every case where there is any direct or inferential evidence with respect to the different degrees of murder, charge the jury with regard to all the degrees, and this rule should be followed where there may be any doubt with regard to whether the higher degree is established or not. This is contemplated by our statute which divides crimes into degrees and which requires the jury to find in the lesser degree in case of doubt. That statute should, however, not be given controlling effect in a case of murder committed in the perpetration of or attempt to perpetrate robbery, because a murder so committed is not divisible into degrees. In such a charge of murder the killing was either committed in the perpetration of or attempt to perpetrate robbery or it was not. If the evidence, as in the case at bar, is clear and undisputed that it was, then the murder is first degree murder and nothing else, and the mere fact that the jury has the power to ignore the evidence and find otherwise does not change the law. In this case the jury was by force of the evidence compelled under their oaths to find that the murder was committed in an attempt to perpetrate robbery. By authority of what law or system of logic could they also legally have found that it was not so committed? If they could not have so found without ignoring both law and fact, no prejudicial error could have been committed in not telling them that they might do so.

The following cases are based upon a statute like ours with respect to murder, and it is accordingly held that, if the jury find that the murder was committed in the perpetration of or attempt to perpetrate a robbery, they have no alternative save to find the perpetrator guilty of murder in the first degree: *State v. Gray,* 19 Nev. 212-218, 8 Pac. 456; *State v. Williams,* 28 Nev. 407, 82 Pac. 353, and cases there cited. See, also, *People v. Wardrip,* 141 Cal. 229, 74 Pac. 744. Some of the very cases that counsel cite to sustain their contention that the court should have charged the jury with re-

spect to second degree murder hold directly to the contrary. For example, in *Davis v. United States*, 165 U. S. at pages 378 and 379, 17 Sup. Ct. at page 362, 41 L. Ed. 750, Mr. Justice Brewer, in referring to the question now under consideration, said:

"There was no testimony to reduce the offense, if any there was, below the grade of murder. If the defendant was sane and responsible for his actions, there was nothing upon which any suggestion of any inferior degree of homicide could be made, and therefore the court was under no obligation (indeed, it would simply have been confusing the minds of the jury) to give any instruction upon a matter which was not really open for their consideration."

So here: If the jury believed that the appellant fired the fatal shot and that he was mentally responsible, then they had no choice, and it was their sworn duty to find him guilty of murder in the first degree.

It is also contended that the court erred in refusing to charge the jury that, if appellant had abandoned the intention to rob before he shot Erickson, then the killing would not have been committed in an attempt to rob, and therefore, unless it was a "willful, deliberate, malicious, and premeditated killing," the killing would not have been murder in the first degree. The court properly refused to so charge, if for no other reason than that there was no evidence whatever that appellant had voluntarily abandoned the attempted robbery before he fired the fatal shot. Indeed, the only evidence upon the question is inferential, and that is directly contrary to such a claim. Upon this question the cases last above cited are decisive against counsel's contention.

Counsel for appellant requested the court to charge the jury that one who is charged with a criminal offense is presumed to have a "good character and reputation." The court refused the request in the language proposed, but charged the jury upon that subject as follows:

"When a person is charged with the commission of a crime, the law presumes that he is a man of average char-

acter, and the failure to call witnesses to prove his general good character raises no presumption against it."

It is now insisted that the court erred in giving the charge aforesaid and in refusing the proffered one. It is contended that the error consists in using the qualifying adjective "average" instead of "good" in defining the presumption with respect to character. It is true that the adjective usually used is "good." Many authorities are, however, to the effect that the law presumes one accused of crime to be possessed of a fair, or ordinarily fair, character. In the case of *Mullen v. United States,* 106 Fed. 894, 46 C. C. A. 24, cited by appellant's counsel on this point, in referring to the presumption now under consideration, it is said:

"It is in consonance with the general principle of law that a man is presumed to stand ordinarily well, and to have at least the average qualities of morality and good conduct."

In *People v. Fair,* 43 Cal. at page 149, Mr. Justice Wallace says that the law presumes every one possessed with a "character of ordinary fairness." To the same effect is 1 Bish. Crim. Proc. (3d Ed.) section 1112, and Underhill, Crim. Ev. section 76. While perhaps it would have been better if the court had used the phrase "good character," yet, in view of all that the court said in the instruction, the jury could not have been misled by the use of the word "average." It seems clear to us that the appellant could not have been prejudiced from anything said or omitted, and therefore this contention cannot prevail.

Finally it is contended that the court erred in its charge to the jury with respect to their right to recommend life imprisonment in case they found appellant guilty of murder in the first degree. The court, in calling attention to the statute upon that subject which confers the right upon the jury to recommend life imprisonment in case they find appellant guilty of first degree murder, charged as follows:

"In considering this question you are not restricted by any rule of law or public policy, but are entitled to decide the question from such considerations as may appeal to you as

reasonably and conscientiously entitled to be weighed in determining the giving or withholding of such recommendation."

It is contended that this charge is open to the same objection as the one which we condemned in the case of *State v. Thorne*, 39 Utah, 208, 117 Pac. 58. This contention is not tenable. The court in this case in no way did, nor attempted to, direct or control the judgment of the jury in arriving at a conclusion upon the question of recommendation. That is what was attempted in the Thorne Case, and it was that attempt which we condemned. While the trial courts discharge their full duty under the statute when they direct the attention of the jury thereto, and that thereunder it is their province to make or withhold a recommendation of imprisonment for life in case they find the accused guilty of murder in the first degree, yet the mere fact that a court may say what is said in the instruction in this case cannot have the effect of avoiding the verdict and the judgment based thereon. To so hold would amount to a mere travesty.

In conclusion we desire to say that after a careful examination of the entire record we cannot avoid the conclusion that the appellant has had a full, fair, and impartial trial. Moreover, all of his rights have been carefully safeguarded at all stages of the trial by vigilant and able counsel, who, although acting without any reward or compensation, have manifested a most commendable interest in the prisoner's behalf.

The judgment should be, and it accordingly is, affirmed.

McCARTY, C. J.

I fully concur in the reasoning of and the conclusions reached by Mr. Justice Frick in the foregoing opinion. In view of the importance of the case I am impelled to make the following additional observations:

The information charges, without referring to the burglary or robbery, that the defendant "willfully, unlawfully, feloniously, deliberately, premeditatedly of his malice aforethought, and with a specific intent to take the life of the

said C. L. Erickson," shot and killed him. Second degree
murder is included in the charge as alleged. But the evi-
dence without conflict shows that at the time defendant fired.
the fatal shot he was perpetrating a burglary (Comp. Laws
1907, section 4336) and attempting to perpetrate a robbery.
The evidence also shows that the burglary, attempted rob-
bery, and homicide were so connected and interwoven, each
one with the other two, that they constituted one transaction.
Comp. Laws 1907, section 4161, provides, among other
things, that murder when "committed in the perpetration of,
or attempt to perpetrate, any . . . burglary, or robbery,.
. . . is murder in the first degree." The killing of Erick-
son was, therefore, under the circumstances as shown by the
undisputed evidence, murder in the first degree, unless the
defendant was, at the time he fired the fatal shot, insane.
Upon this point, as the record now stands, there is no room
for doubt. The question upon which there seems to be a
difference of opinion is as to whether second degree murder
is included in a homicide committed in the perpetration of
or attempt to perpetrate a burglary or robbery. In all
classes and kinds of intentional murder in which the crime
is divided into degrees, the element that distinguishes first
degree murder from murder in the second degree is the "pre-
meditation and deliberation with which first degree murder
is committed." (2 Bish. Crim. L. (7th. Ed.) section 728; 21
A. & E. Enc. L. 157; 21 Cyc. 728.) Under section 4161,
*supra,* murder committed in the perpetration of any of the
felonies therein enumerated is murder in the first degree,
regardless of whether the killing is premeditated and delib-
erate or even intentional. The killing may be accidental,
but it nevertheless is murder in the first degree. (*State v.
Thorne,* 39 Utah, 208, 117 Pac. 58.)

I am unable to conceive of a state of facts or circum-
stances, and certainly none has been suggested, under which
a murder committed in the perpetration of or attempt to
perpetrate any of the felonies mentioned in section 4161,
*supra,* would or could be less than murder in the first degree.
As I have stated, the elements of first degree murder,

namely, premeditation and deliberation, that distinguishes first degree murder from second degree murder, are not essential, when the crime is committed in the perpetration of or attempt to perpetrate any one or more of the felonies referred to, to make the crime murder in the first degre. (21 Cyc. 719-723; 21 A. & E. Enc. L. 167; *State v. Thorne,* 39 Utah, 208, 117 Pac. 58.) The reason for the rule is well stated by the Supreme Court of California in the case of *People v. Milton,* 145 Cal. 169, 78 Pac. 549, as follows:

"In this (referring to the class of murder committed in the perpetration of or attempt to prepetrate arson, rape, robbery, or burglary) the law has said to the malefactor: 'If in your perpetration of or attempt to perpetrate arson, rape, robbery, burglary, or mayhem you shall take the life of a fellow being, intentionally or unintentionally, your crime is murder in the first degree. The killing may be willful, deliberate, and premeditated, or it may be absolutely accidental. In either case, you are equally guilty. The elements of willfulness, deliberation, and premeditation are not indispensable to your crime. The murder, under section 187 of the Penal Code, is established, in that the killing is unlawful, it having been perpetrated in the performance or attempt to perform one of these felonies, and the malice of the abandoned and malignant heart is shown from the very nature of the crime you are attempting to commit. Therefore, if in perpetrating arson, although in the belief that the building is unoccupied, some person within the building, unknown to you, shall lose his life, you are guilty of murder in the first degree. Or if in burglariously entering premises which you believe to be unoccupied you shall accidentally take the life of one whose presence is unsuspected by you, still your crime is murder in the first degree.' That such is the true meaning and construction of our statute there can be no doubt."

(*State v. Thorne,* 41 Utah, 414, 126 Pac. 286; *Morgan v. State,* 51 Neb. 672, 71 N. W. 788; *State v. Young,* 67 N. J. Law, 224, 51 Atl. 939.)

Counsel for appellant, proceeding upon the theory that second degree murder is necessarily included in a homicide committed in the perpetration of or attempt to perpetrate any of the felonies enumerated in section 4161, *supra,* argues that in a prosecution for such murder it is the province of the jury, under section 4892, if the defendant is found guilty, to determine whether he is guilty of first de-

gree or second degree murder. The section referred to reads. as follows:

"Whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty."

The difficulty with counsel's position is that under the plain provisions of section 4161 murder committed in the perpetration of or attempt to perpetrate any felony mentioned therein is first degree murder only, and that section 4892 has no application. As I have suggested, there is no conceivable state of facts or circumstances under which this class of murder can be anything less than murder in the first degree. For illustration, take a case in which an incendiary, believing that a certain building is uninhabited and unoccupied, willfully and maliciously applies the torch to it, and after the structure is enveloped in flames he discovers that it is occupied by a human being who is unable to make his escape therefrom, and the incendiary makes every effort in his power to rescue such party but is unable to do so. Under such circumstances the killing would be murder in the first degree. I think it is plain that in a homicide belonging to this class there is no line of demarcation that distinguishes it into degree. If it may be separated into different degrees, where is the line to be drawn between the first and second degree? Is it second degree murder when it appears from the evidence that the defendant in the commission of or attempt to commit one or more of the felonies mentioned had no specific intent to take human life and that the killing was wholly accidental? The question is answered by the statute which declares that the killing of a human being even under such circumstances is murder in the first degree.

The Texas Court of Appeals, in construing a statute containing provisions which are substantially the same as sections 4161 and 4892, *supra,* said:

"The statute, and the decisions construing that statute, have not yet laid down the proposition that the accused firing at the intended victim in cases of robbery and killing another party would reduce that killing to murder in the second degree. The shooting would still be murder in the first degree, because the statute ex-

pressly says that all murder in robbery or in the perpetration of robbery would be murder in the first degree. *This statute eliminates murder in the second degree in homicides of this character."* (Italics mine.)   (*Milo v. State,* 59 Tex. Cr. R. 196, 127 S. W. 1025.)

True the jury have the power in this class of homicides to find the accused guilt of any of the lower degrees necessarily included in the charge set forth in the information, or to acquit him.   They may do this even though it is conclusively shown by the evidence that he is guilty of murder in the first degree and there is no evidence tending to reduce the crime to a lower degree.   But it does not follow that because a jury have the power to ignore the evidence, and, in violation of their oaths, to bring about a miscarriage of justice by refusing to do their duty, the court should in its instructions authorize and in a sense invite them to do so.

I am clearly of the opinion that in this case the court did not err in refusing to instruct the jury on the question of murder in the second degree.   As I read the record and understand the law applicable thereto, second degree murder is not in this case.   The defendant, under the undisputed evidence, is either guilty of murder in the first degree or he is not guilty at all of the crime of which he stands convicted.   (*State v. Thorne, supra.*)

Under section 4336 all that was necessary for the state to prove in order to establish first degree murder was that defendant, while he was perpetrating or attempting to perpetrate burglary or robbery, shot and killed Erickson, and the question of whether the killing was deliberate, premeditated, and with malice aforethought, or whether it was unintentional on the part of defendant, was immaterial.   The court, by charging the jury that before the defendant could be convicted of murder in the first degree the state must prove beyond a reasonable doubt that the killing was deliberate, premeditated, with malice aforethought, and with the "specific intent to take the life of said C. L. Erickson," imposed upon the state a greater burden to prove first degree

murder than the law applicable to the facts required. In other words, the instruction, notwithstanding the evidence conclusively shows that the homicide was committed in the perpetration of burglary and attempted robbery, required the jury, before they could legally convict the defendant of murder in the first degree, to find from the evidence beyond a reasonable doubt that the killing was willful, deliberate, premeditated, and with malice aforethought. The charge, in this regard, was therefore much more favorable to the defendant than the law and the facts warranted. The contention seems to be that because the court erroneously instructed the jury that in order to convict the defendant of murder in the first degree they must find from the evidence beyond a reasonable doubt that the fatal shot was fired willfully, deliberately, premeditatedly, with malice aforethought, and with the specific intent to take the life of Erickson, the court should have committed further error favorable to the defendant and to the prejudice of the state by submitting to the jury the question of second degree murder.

Moreover, as I read and construe section 4161, an instruction on the question of second degree murder would, in effect, have withdrawn from the consideration of the jury the question of whether the homicide was committed in the perpetration of burglary and attempted robbery. The court could not have submitted the question of second degree murder without in effect annulling the statute. It sometimes happens that the rapist, burglar, robber, and incendiary, in perpetrating or attempting to perpetrate one or more of the felonies mentioned in section 4161, kills, without any specific intent so to do, a human being. The killing, as a matter of fact, may be wholly accidental. In such case the killing is not deliberate nor premeditated, but is, nevertheless, murder in the first degree. Take for example a case such as I have suggested in which the court, in defining murder in the first degree, charges the jury in the language of the statute, namely, that "every murder . . . committed in the perpetration of or attempt to perpetrate

any rape, arson, burglary, or robbery, . . . is murder in the first degree." It must be conceded that, if the statute is to be given any effect whatever, such instruction correctly defines murder of the first degree when the homicide is committed in the perpetration of or attempt to perpetrate any of the felonies mentioned therein. Now it is apparent that should the court, after giving the instruction suggested, proceed to define second degree murder, it must repeat the language of the statute down to and including the words "in the" and then substitute the words "second degree" for the words "first degree" which would, in effect, annul the statute, and, as I have stated, take from the jury the question of first degree murder.

It is suggested that there is evidence tending to show that defendant was addicted to the use of morphine or opium, and that the use of such drugs had weakened and impaired his mental faculties to such an extent as to render him incapable of deliberation and premeditation, or of forming a design to kill, thereby reducing the crime from first degree to second degree murder. The court carefully and elaborately charged the jury on the question of insanity, and the defendant's rights in that regard were carefully guarded. Upon that issue the court instructed the jury in part as follows: "An insane person is not criminally responsible under the law for his acts. The words 'insane person' include . . . distracted persons and persons of unsound mind. . . . When evidence is introduced tending to prove insanity sufficient to raise a reasonable doubt of defendant's sanity at the time of the commission of the act, then the presumption of sanity ceases, and the prosecution is bound to prove the sanity of the accused beyond a reasonable doubt. So in this case, if the jury, after considering all the evidence, entertain a reasonable doubt of the sanity of the defendant at the time of the alleged offense, then he must be acquitted. . . . When the evidence is completed, and the case finally submitted to you, the defendant *cannot be convicted of any crime* unless from all the evidence in the case, taken together, you are satisfied, beyond a reasonable doubt,

that the defendant was sane at the time the act in question was committed." (Italics mine.) "You are instructed that if you are not satisfied from a careful and conscientious consideration of all the evidence in the case, beyond a reasonable doubt, that at the time of the commission of the act charged the defendant knew right from wrong with respect to said act, then you cannot find him guilty of any crime; and so far as this case is concerned it is not material what caused such insanity."

Assuming, for the sake of the argument, that the defendant, without either deliberation or premeditation, and without forming a design or intent to take human life, fired the fatal shot that killed Erickson—and we may go a step farther and assume that the weapon was accidentally discharged—the killing, nevertheless, was, under the statute, murder in the first degree, unless the defendant, at the time he fired the shot, was insane. Of course, if he were insane he could not legally be convicted of any crime. The jury, however, found against the defendant on the question of insanity.

I have examined the record in this case with more than ordinary care and am forced to the conclusion that the defendant had a fair and impartial trial and that he was properly convicted.

STRAUP, J. (dissenting).

Our statute (Comp. Laws 1907, section 4159) defines murder to be "the unlawful killing of a human being with malice aforethought." Section 4161 defines the degrees of murder. It is:

"Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premediated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved

mind, regardless of human life, is murder in the first de-
gree. Any other homicide committed under such circum-
stances as would have constituted murder at common law
is murder in the second degree."

The information charged first degree murder thus: That
the defendant "willfully, unlawfully, feloniously, deliber-
ately, premeditatedly, of his malice aforethought, and with
the specific intent to take the life of the" deceased, shot and
killed him. The facts are referred to by Mr. Justice Frick.
The state, as it had the right to do, went to the jury on two
theories: One that the defendant in the commission of, or
attempt to commit, a robbery, shot and killed the deceased;
the other, that the defendant willfully, maliciously, delib-
erately, and premeditatedly, and with the specific intent
to take the life of the deceased, and as specifically alleged
in the information, shot and killed him. There is ample
evidence to support both. The court submitted the case on
both and in such respect charged that, if the jury found
that the defendant in the commission of or attempt to com-
mit a robbery or burglary shot and killed the deceased, that
constituted first degree murder. It further charged that
"every murder perpetrated by poison, lying in wait, or any
other kind of willful, deliberate, malicious and premed-
itated killing," was also first degree murder. The court in
such particular and at some length charged what was meant
by the terms "willful," "deliberate," and "premeditated." It
then charged that, before the defendant could be convicted
of murder in the first degree, the state must prove beyond
a reasonable doubt that "the killing was unlawful"; that
it was "deliberate"; that it was "premeditated"; that it
was "with malice aforethought"; and that it "was with the
specific intent to take the life of" the deceased.

The defendant's theory was that by the habitual and ex-
cessive use of morphine and other drugs his mental facul-
ties were impaired to such an extent as to render him (1)
wholly irresponsible for his acts; or (2) incapable of delib-
eration and premeditation, or of forming or entertaining a
design or an intent to kill or rob. Conformably to the first,

he requested the court to charge that if the jury found that. the defendant, because of an habitual use of such drugs, had become wholly irresponsible for his acts, they should acquit him; conformably to the second, that if the jury found "that. the defendant was intoxicated by the use of morphine or other drugs at the time of the killing, you may take that fact into consideration in determining his condition of mind,. though such intoxication may have been voluntary," that. "in this case, if you believe from a preponderance of the evidence that the defendant was addicted to the use of morphine or opium or both, and by reason of the continued and habitual use of either or both of such drugs was brought or left in such weakened mental condition that he was incapable of deliberation and premeditation, as defined in these instructions, he is not guilty of murder in the first degree." The defendant also requested the court to define murder in the second degree and to submit such question to the jury. The court refused to give these requests.

Notwithstanding the charge, *that before the jury could convict the defendant of first degree murder the state was. required to prove that the killing was unlawful, willful, deliberate, premeditated, with malice aforethought, and with. the specific intent to take the life of the deceased,* the court,. nevertheless, refused to submit to the jury the question of second degree murder; and, by the charge, bound the jury to convict the defendant of first degree murder, or to find him not guilty. The court submitted to the jury the question of the defendant's insanity or irresponsibility, but with the direction that, "before the defendant can be convicted of murder in the first degree upon the theory" that the deceased "was killed by the defendant while the defendant was engaged in the perpetration of or attempt to perpetrate a robbery or burglary, you must be satisfied beyond a reasonable doubt, from all the evidence in the case, that the defendant, at the time of the perpetration or attempt to perpetrate said robbery or burglary, had formed the intent to commit said robbery or burglary, and that he had the mental capacity to distinguish between right and wrong with ref-

erence to said robbery or burglary; and, if you should find
from the evidence that the defendant at the time in ques-
tion had not the mental capacity to form an intent to perpe-
trate a robbery or burglary, then you cannot convict him of
murder in the first degree." The court then, after charg-
ing on burden of proof as to the issue of insanity, charged
that "the test of responsibility for a criminal act when in-
sanity is relied upon as a defense is the capacity of the de-
fendant to distinguish between right and wrong at the time
of and with respect to the act which is the subject of in-
quiry"; and if the jury were "not satisfied beyond a reason-
able doubt that the defendant had the capacity to distin-
guish between right and wrong at the time of and with ref-
erence to the act in question, then you cannot convict him."

The refusal of the requests, and the charge in the partic-
ulars referred to, present the principal questions for review.
The most serious is the refusal to submit to the jury the
question of second degree murder, and binding them, as did
the court, to either find the defendant guilty of first degree
murder or to acquit him. This presents two questions: (1)
May the court, in any case upon a charge of first degree
murder, and upon a plea of not guilty and a trial, itself, in-
stead of the jury, determine the degree of murder? And
(2) if so, is this a proper case in which the court may do so?
Because of our recent decision in the case of *State v. Thorne,*
41 Utah, 414, 126 Pac. 286, where it was held that the court
in that case was justified in refusing to submit to the jury the
question of second degree murder, I approach the first with
some hesitation. While I think the doctrine in the Thorne
Case is stated too broadly, still, were it not for the second
question, and the extent to which it is here carried, I should
be inclined to yield assent without further observations.

I have already referred to the statute defining murder
and first and second degree murder. Section 4893 of the
statute provides that "the jury may find the defendant
guilty of any offense, the commission of which is necessarily
included in that with which he is charged." Section 4892,
that "Whenever a crime is distinguished into degress, *the*

*jury,* if they convict the defendant, *must find* the degree of the crime of which he is guilty." Section 4906, that "upon a plea of guilty of a crime distinguished or divided into degrees, the court must, before passing sentence, determine the degree." Here, then, are express statutes which, on a plea of not guilty and a trial require the jury, and on a plea of guilty the court, to determine the degree, whenever a crime is distinguished into degrees. Murder, under the statute, is distinguished "into degrees." The charge here is murder. It is charged in the first degree. Second degree is "necessarily included in" the charge of first degree murder. The one is just as much charged in the information as is the other. I think the statutes referred to are peculiarly applicable to a charge of first degree murder. I see no license to disregard them or to hold them inapplicable to a charge of murder as here charged, a willful, deliberate, malicious, and premeditated murder. Under such statutory provisions I think the great weight of authority is that upon an information or indictment for first degree murder, and upon a plea of not guilty and a trial, it is the exclusive province of the jury to determine the degree of murder, not only when the charge or claim is that the murder was willful, deliberate, and premeditated and with malice aforethought, but also when perpetrated by poison, or done in the commission of or attempt to commit felonies enumerated in the statute defining murder in the first degree. The cases so holding are collected and cited in notes to the case of *State v. Phinney,* 12 Ann. Cas. 1081, and 12 L. R. A. (N. S.) 935. The reasons for the rule are stated in those cases. Other cases in support of the rule are also cited and referred to by the appellant in his brief. The California and Nevada cases cited in the prevailing opinion do not, in my judgment, support a contrary doctrine. In 19 Nev., cited, the question of second degree murder was not withheld from but was expressly submitted to the jury. In 28 Nev. and in 141 and 145 Cal., cited, questions of withholding or submitting second degree murder were not involved. Neither is the case of *Davis v. United States,* 165 U. S. 373, 17 Sup.

Ct. 360, 41 L. Ed. 750, in point, for there the prosecution was under a statute different from ours; one where homicide was not divided into degrees of murder as is the case under our statute, and where there was no statute, as we have, "that whenever a crime is distinguished into degrees, *the jury,* if they convict the defendant, *must find* the degree of the crime of which he is guilty." There, however, are cases supporting a contrary or "minority" rule, the rule stated in the Thorne Case. They are also collected and cited in notes to 12 Ann. Cas. and 12 L. R. A. (N. S.) heretofore referred to. Some of them may be distinguished because of dissimilar statutes. That is especially true of the cases from Nebraska and New Jersey. There seem to be no statutes in those states corresponding with sections 4892 and 4906 of our statute. Others may be distinguished because no request to charge on second degree murder was asked. However, there are cases there cited, notably from Michigan and Iowa, which apparently support the rule laid down in the Thorne Case.

The ruling is here defended and upheld upon the theory that the evidence without dispute shows the murder was committed in the commission of or attempt to commit a robbery; and, since the statute declares a murder so committed to be murdered in the first degree, the court was justified in refusing to submit to the jury the question of second degree murder and in giving the binding instruction to convict the defendant of first degree murder or to find him not guilty. In this no distinction is drawn between a proper statement of the law and a binding instruction to the jury which takes from them the ascertainment and determination of the degree. Of course, a murder committed in the commission of or attempt to commit a robbery, or perpetrated by poison, is, by the statute, declared to be first degree murder; and the jury should be so instructed, and that if they so find the facts beyond a reasonable doubt to convict the defendant of first degree murder. So, too, does the statute declare that "any other kind of willful, deliberate, malicious and premeditated killing," or "perpetrated

from a premeditated design unlawfully and maliciously to effect the death" of a human being, is also first degree murder. Declaring to the jury the law as to what constitutes first degree murder is one thing; withholding from them the right to find second degree murder, when by the information second degree as well as first degree is charged, is quite another and different thing. Asserting, as is done, that since the statute declares a *"murder committed* in the perpetration of or attempt to perpetrate a robbery," etc., is first degree murder, and if the evidence shows the "murder (defined by the statute to be 'the unlawful killing of a human being with malice aforethought') was committed" that way, the court is not required to submit to the jury second degree murder, adds nothing; for the statute as well declares a "murder committed" under other enumerated circumstances is also first degree murder. Yet it is said if the evidence shows a "murder committed" in the perpetration of a robbery, etc., second degree murder need not be submitted to the jury, because the statute defines that to be first degree murder; but if the evidence shows a "willful, deliberate, malicious and premeditated" murder, second degree murder should be submitted, though the statute as well declares that also to be first degree murder. The question is asked, how can a murder committed in the perpetration of a robbery, etc., be second degree murder? As well ask how can a willful, deliberate, malicious, and premeditated murder be second degree murder? Let the thought be carried a little further by asking: How can a guilty man be innocent; and how can a verdict of not guilty be rendered in either supposed case?

The declaration in an early day of Chief Justice Shaw in a criminal case (Commonwealth v. Porter, 10 Metc. [Mass.] 263) may not be here amiss:

"It is the proper province and duty of judges to consider and decide all questions of law which arise, and that the responsibility of a correct decision is placed finally on them; that it is the proper province and duty of the jury to weigh and consider evidence, and *decide all questions of fact:* and that the responsibility of a cor-

rect decision is placed upon them. And the safety, efficacy, and purity of jury trial depend upon the steady maintenance and practical application of this principle."

The further observation is there made by him that while it is the duty of the court to declare the law and the jury to accept it as so declared, they, nevertheless, in a criminal case by a general verdict "declare the law as well as the fact." And that is our statute. Comp. Laws. 1907, section 4876. Every first degree murder involves elements of a willful, deliberate, malicious, and premeditated killing. On the first appeal in the Thorne Case (39 Utah, 208, 117 Pac. 58), we held that allegations in an information of an unlawful, malicious, deliberate, and premeditated killing are supported by proof of a killing committed in the perpetration of or attempt to perpetrate a robbery, on the theory that a willful and premeditated intent to commit the felony is transferred from that offense to the homicide actually committed and is the legal equivalent of and tantamount to the allegations of a willful, deliberate, and premeditated killing. And on no other theory can such a ruling be upheld.

When, therefore, all the provisions of the statute referred to are considered, I see no reason for holding that when the murder is shown to have been committed without dispute by poisoning, or in the commission of, or attempt to commit, a felony enumerated in the statute defining first degree murder, the degree of murder is for the court; but when the evidence without dispute, and by the most positive and direct testimony shows the murder to have been committed, not in such manner, but by a willful, deliberate, malicious, and premeditated killing with malice aforethought, a murder also defined by the statute to be first degree murder, the degree is for the jury. Under the statute I do not see wherein the court has any greater license in the one case than in the other to itself, instead of the jury, determine the degree of murder. The statute requiring the jury to "find the degree," where the crime is "distinguished into degrees," makes no such distinction. In considering the power of the court and the province of the jury with respect to the sub-

ject in hand, we must bear in mind the well-recognized distinction between our civil and criminal jurisprudence. In a civil case, if all the material allegations of the complaint are established by evidence without dispute, the court is given the power, and it is its duty, if requested, to direct a verdict for the plaintiff; and though the case under such circumstances should be submitted to the jury, and a verdict nevertheless rendered in favor of the defendant, the court, on its own motion, or upon plaintiff's may set the verdict aside, as being against and contrary to the evidence. The court may not do that in a criminal case. Though all the allegations of the information or indictment be established by most direct and positive evidence wholly without dispute, and though the defendant offered no evidence whatever, the court, nevertheless, may not direct a verdict against him; and if upon a submission of the case, under such circumstances, a verdict is rendered in favor of the defendant, which manifestly is contrary to and against all the evidence and wholly unsupported by it, still the court may not, upon its own motion or that of the state, and against the objection of the defendant, set the verdict aside.

Take the case in hand, where it is claimed the evidence without dispute shows first degree murder; and let it further be assumed that the defendant had offered no evidence of any kind, but had rested when the state rested, and the jury had rendered a verdict of not guilty—a verdict let it be assumed in the very teeth of all the evidence—yet the court could neither on its own motion nor that of the state have interfered with it. This proposition is conceded. What significance is to be attached to it? That the jury in a criminal case, so far as concerns the state, are not only the judges of the credibility of the witnesses and the weight to be given the testimony, but are also the exclusive judges of the facts. They, as concerns the state may or may not decide questions of fact and find a verdict conformably with the evidence. They, in such respect, are given unlimited power, wholly uncontrolled by the court, to decide all questions of fact and render a verdict contrary to the evidence. It may be said

the jury in such case would not properly perform their duty. That is not the point. The pertinent question is: May the court in such case influence, coerce, or control the jury, or interfere with their verdict when so rendered, in the very teeth of all the evidence? When a jury in a civil case renders a verdict not conformable with and not supported by the evidence, the court may interfere on its own motion, or that of the party aggrieved. So may it in a criminal case on behalf of the defendant, when a verdict is rendered to his prejudice not conformable with and not supported by the evidence, or one against law. But, as concerns the state, the court may not interfere, though the verdict is wholly unsupported by, and is contrary to, all the evidence; and though the jury in the rendition of it disregarded both law and evidence.

It is said in some of the cases that, if the evidence without dispute shows first degree murder, the court should not submit the question of second degree to the jury and thereby permit or give them to understand that they may render such a verdict when there is no evidence to support it. But in such case such a verdict would not be supported by evidence. It would not only amply support such a verdict, but would also support a verdict of a higher degree, of first degree murder. Evidence which would support first degree, of necessity must also support second degree murder. That is the effect of the holding in *People v. Dillon*, 8 Utah 92, 30 Pac. 150. If, however, the argument is sound and is carried to a conclusion, then why should the court submit a case at all to the jury when the evidence wholly without dispute and by the most positive and direct testimony manifestly shows murder in the first degree committed by the defendant, and no evidence whatever offered by him to controvert it? To say, as is said in some of the cases, the court is required to submit the case to the jury to determine whether the defendant committed the acts constituting the charged offense, is to beg the question; for such a contention assumes some conflict or uncertainty in the evidence, either with respect to the commission of the offense, or as to

the person who committed it, or that such questions rest upon inferences and deductions and not upon positive, direct, and uncontroverted evidence. Let us adhere to the admitted proposition, the conceded premises, the defendant's guilt of first degree murder clearly shown by the most positive and direct evidence wholly without conflict. According to all the cases no matter how conclusive may be the evidence in favor of the state and against the defendant, the court, nevertheless, upon a plea of not guilty and a trial, is bound to let the case to the jury. If they in such case have the unlimited power, wholly uncontrolled by the court, to render a verdict of not guilty, then why have they not the same power to render any other verdict, which on the information or indictment may be rendered?

It seems somewhat of an anomaly to say that the jury have the unlimited power, wholly uncontrolled by the court, to render a verdict of not guilty in disregard of all the evidence, but may not render a verdict of second degree murder because the evidence without dispute shows first degree murder. What appears to be a conclusive answer to the contention is this: Had the jury in this case, notwithstanding the court by its charge bound them to render a verdict of first degree murder or to find the defendant not guilty, rendered a verdict of murder in the second degree, what power under our Constitution or the statute had the court, either on its own motion, or that of the state, and against the objection of the defendant, to set the verdict aside? None whatever. This but shows that the jury, so far as concerns the state, had the right and power to render any kind of a verdict which under the information could be rendered; and any verdict so rendered could not, against the defendant's objection, be questioned or assailed on the ground that it is against law or the evidence. And if such a verdict had been rendered, and the court were powerless to interfere, then what right had the court in the first instance, on the submission of the case to the jury, against the defendant's requests and objections, to so restrict, direct, and control the jury as was here done? The court may, and it

is its duty when requested, to inform the jury of the different verdicts which on the information or indictment may be rendered. But the court may not, against the defend-ant's requests and objections, restrict, direct, or influence the jury as to which of such verdicts should be rendered by them. And as second degree murder is necessarily included in the charge of first degree murder, and as the statute expressly requires the jury, not the court, to determine the degree, where the crime is distinguished into degrees, I think the question of second degree murder ought to have been submitted to the jury.

I have thus considered the question from the standpoint that the evidence without dispute shows murder in the first degree. I shall now consider it from the standpoint that there is evidence to justify a verdict of second degree murder. There is evidence to show that the defendant was addicted to the use of morphine or opium. The controversy in that respect was: To what extent had he used such drugs, and what effect had they upon him? The contention of the defendant was twofold: One, a destruction or impairment of his mental faculties to such an extent as to render him wholly irresponsible for his acts; the other, that his mental faculties were weakened and impaired to such an extent as to render him incapable of deliberation, premeditation, or of forming a design or intent to kill, thereby reducing the crime from first degree to second degree murder. The state contended that the defendant, though addicted to the use of the drugs, had not used them to such an extent as to render him either irresponsible for his acts, or incapable of deliberation or premeditation or of forming a design or intent to kill. The court submitted the case to the jury on the theory only of whether the defendant was irresponsible for his acts; whether he had the capacity to distinguish right from wrong as to the robbery; whether he was insane. The defendant's evidence as to his insanity or entire irresponsibility was not strong. It, however, is conceded to be sufficient to require a submission of such issue to the jury. No one has questioned that. If it was so suf-

ficient, I do not see why the defendant was not also entitled to go to the jury on the theory of an impairment of his mental faculties by the use of the drugs to such an extent as to render him incapable of deliberation and premeditation, or of forming a design or an intent to kill.

The jury on the evidence, finding that the defendant was not wholly irresponsible, might have reached the conclusion, had they not been directed against it, and had the question of second degree murder been submitted to them, that the defendant's mental faculties, because of an habitual and excessive use of the drugs, nevertheless, were impaired to such an extent as to render his capacity to deliberate and premeditate, or to form a design or an intent to kill, reasonably doubtful, and thus induced to find him guilty of second degree murder. And had such a verdict been rendered, on such a theory, I do not see how it could be said to be against, or unsupported by, evidence, in view of the concession that there was sufficient evidence to carry the case to the jury on the issue of insanity and irresponsibility *caused by an excessive and habitual use of the drugs.* But the jury were not allowed to consider the effect of such drugs upon the defendant's mind for the purpose of determining whether he had the capacity to deliberate, premeditate, or of forming an intent to kill. And this, notwithstanding the court submitted to the jury the question of first degree murder on two theories: One, that the murder was committed in the commission of or attempt to commit a robbery; the other, that the killing was willful, deliberate, with premeditation and malice aforethought, and with the specific intent to take the life of the deceased, and as specifically in the information charged. So, though it be claimed that the jury, on the theory that the murder was committed in the commission of or attempt to commit a robbery, could not consider the excessive use of the drugs and the effect they had upon the defendant's mind except to determine whether he was wholly irresponsible, they, nevertheless, had the right to consider such use and effect on the theory that the killing was willful, deliberate, and premeditated. If

not, then as well say a jury in a charge of first degree mur-
der could only consider the defendant's intoxication or the
effects of alcoholism upon him, only for the purpose of de-
termining whether he was insane, or wholly irresponsible for
his acts, and not whether he had the capacity to deliberate
and premeditate, and in determining whether he was guilty
of first or second degree murder. The Thorne Case in-
volved no question as to the defendant's mental capacity or
condition. In such respect this case is dissimilar to that.
So upon the evidence I think the court ought to have sub-
mitted to the jury the question of second degree murder.

Now, the defendant requested the court to charge that
if the jury found the defendant was addicted to the use of
the drugs they should consider the effect thereof, whatever
they might find in such particular, in determining his con-
dition of mind and his capacity to deliberate and premedi-
tate. As has been seen, the court refused this and sub-
mitted to the jury the consideration of the effect of such
drugs only in determining whether the defendant was ca-
pable of distinguishing between right and wrong "with ref-
erence to the robbery and burglary" and "the mental ca-
pacity to form the intent to perpetrate a robbery or burg-
lary." And it is said this is all that was necessary because
the evidence shows the murder was committed in that man-
ner. But that is not the only theory on which the state tried
the case and went to the jury and on which the court, on
behalf of the state, submitted it to them. The court also
submitted it on the theory of a willful, deliberate, malicious,
and premeditated killing. There, too, is ample evidence
to support that. It about as strongly supports the one as
the other. And the court, notwithstanding a submission
on the theory that the murder was committed in the com-
mission of or attempt to commit a robbery, nevertheless, in
most direct and positive terms, unqualifiedly charged the
jury *that before they could convict the defendant of first de-
gree murder* the state was required to prove beyond a rea-
sonable doubt that *the killing was unlawful, that it was de-*

43 Utah—12

*liberate, that it was premeditated, that it was with malice aforethought, and that it was with the specific intent to take the life of the deceased.* Right or wrong, it was the duty of the jury to accept that. Comp. Laws 1907, section 4876. It must be presumed that they did so. And therefore, by their verdict, must it also be presumed that they found the the murder was committed in such manner. They could not have done otherwise without disobeying the charge in such particular. It is said this charge, though no complaint is made of it by either party and though it is not before us for review, is wrong; and then is it asserted that the claim is made further error should have been committed by submitting second degree murder. The proposition to be demonstrated is: Was or was not the court required to submit to the jury second degree murder? If the conclusion, that to submit such question would have been error, is to be taken as the major premise of the syllogism, or the negative assumed of the proposition sought to be proved, then of course there is nothing to demonstrate. For, when it is once assumed, or the conclusion is reached, that to submit such question would have been error, all argument must cease. No matter what we may think of the charge submitting to the jury the question of a deliberate, malicious, and premeditated murder and requiring the jury to find that kind of murder to convict the defendant of first degree murder, it nevertheless, uncomplained of by either party, was given as the law of the case which the jury were required to accept and to render a verdict accordingly; and the presumption that they did so must equally be indulged whether the charge is right or wrong, favorable or unfavorable to the defendant or the state. The information in express terms charged a deliberate, malicious, and premeditated murder. Under that information the state could prove the commission of such a murder or one committed in the perpetration of a felony. It was to its advantage to go to the jury, as it did, on both theories. And since the court submitted to the jury the question of a deliberate, malicious, and premeditated murder, and required the jury to find.

that the murder was committed in such manner before they could convict the defendant of first degree murder, then, it seems to me, must it necessarily follow that the court ought also to have submitted the question of second degree murder and the effect, if any, the use of the drugs had on the defendant's mental capacity and condition to deliberate and premeditate. To escape this conclusion must it be presumed that the jury did not obey the positive and commanding language of the court as to the finding of a deliberate, malicious, and premeditated murder before they could convict the defendant of first degree murder—that they did not consider such question so submitted to them and did not find that the murder was so committed—or else must there be a different finding made on the record that the murder was not committed in such manner but in the commission of or attempt to commit a robbery? I think we may not do either. We may not in a civil, much less a criminal case, try it de novo on the record, and treat as found that which may be, or even ought to have been, found.

There is another question of less moment—the charge with respect to the test of insanity or irresponsibility. The court charged:

"The test of irresponsibility for a criminal act, when insanity is relied upon as a defense, is the capacity of the defendant to distinguish between right and wrong at the time of and with respect to the act which is the subject of inquiry."

This thought is repeated several times in other portions of the charge. The defendant, by his request, asks the court to also embody the additional element of "sufficient will power to govern his action" and to "resist impulses to commit crime." The refusal to so charge is also complained of.

Insanity or mental unsoundness embraces many different species. In some cases the subject, because of a diseased or disordered mind, lacks intelligence and the power to reason—to think rationally. Such a person is therefore incapable of comprehending the nature and quality

of an  act done and of distinguishing between  right
and wrong with respect to it.  When such is the particular
form of malady the test is, as was charged:  Did the de-
fendant have the capacity to understand the nature and
quality of the act, and to distinguish. between right and
wrong with respect to it?  Many cases so hold.  But it also
is well recognized in medical jurisprudence that one may
be capable of understanding the nature and quality of an
act and know that it is morally wrong or unlawful, yet,
understanding this, may, because of a diseased, impaired,
or deranged mind, lack will power and ability to choose
and to control conduct, or actions, in the light of his under-
standing and intelligence.  In such case the true test is not
capacity merely to distinguish between the rightfulness and
wrongfulness of an act committed, but also sufficient will
power to choose whether he shall do or refrain from doing
it.  Many cases so hold.  Lack of will power may be caused not
only by mania, hallucinations, or irresistible impulses to
commit crime, or other maladies impelling violence or im-
pulses  to  commit  crime,  but  also  by  maladies of
a negative character showing inability to control, to govern
generally, to choose, to will.  It is common knowledge that
that portion of the brain which is concerned with the will
may be so diseased or impaired as to destroy will power and
yet the person may not be possessed of mania, hallucina-
tions, or irresistible impulses.  I see no evidence that the
defendant was possessed of "irresistible impulses to commit
crime," or that his malady was of such a character or took
such a form.  The court therefore was not required to em-
body such an element in the charge in stating the test of
insanity.  But I think there is evidence of a malady, if any
at all, involving a diseased or an impaired will power.
Again, it is common knowledge that the general effect of
an excessive and habitual use of morphine and opium is to
impair, and in some instances to wholly destroy, will power.
It is this faculty which usually is first affected by the use
of such drugs.  Evidence of this was also given at the trial.
We are therefore concerned with a malady which involves

not only the faculty to think rationally, and to reason, and the capacity to understand right from wrong, but also the faculties of the will, the capacity, the power, to choose, to govern and to control conduct and actions. In view of this I think the court in its charge too much restricted the test and ought to have charged substantially as was charged and approved in the case of *Davis v. United States,* 165 U. S. 373, 17 Sup. Ct. 360, 41 L. Ed. 750, and in accordance with the doctrine stated in *State v. Reidell,* 9 Houst (Del.) 470, 14 Atl. 550, and supported by many other cases, when the particular malady involves or affects will power.