[Crim. No. 1850. In Bank.—May 29, 1914.]

THE PEOPLE, Respondent, v. JOHN BOSTIC, Appellant.

CRIMINAL LAW—HOMICIDE—PLEA OF GUILTY—REFUSAL TO PERMIT WITHDRAWAL.—It is not an abuse of discretion, for the court in a murder case to refuse to permit the defendant to withdraw his plea of "guilty" and to substitute therefor a plea of "not guilty," where he was fully advised as to his rights upon his arraignment, but declined the offer of counsel, and was neither surprised nor cajoled when he entered his plea.

ID.—MURDER—COMMISSION IN PERPETRATION OF ROBBERY.—A murder committed in the perpetration or attempt to perpetrate robbery is murder of the first degree. Section 189 of the Penal Code is not meant to apply only to such a murder as would be included in the scheme of robbery and planned as a part of the execution of that crime.

ID.—INSANITY OF ACCUSED—CONCLUSION OF TRIAL JUDGE ON HEARING OF APPLICATION TO WITHDRAW PLEA.—It cannot be said that the trial judge in this case, who heard the application of the accused to withdraw his plea of not guilty, erred in finding that there was no evidence of his insanity.

ID.—ISSUE OF INSANITY—TESTIMONY THAT ACCUSED APPEARED RATIONAL.—It was proper for the court, in such case, to permit witnesses to testify to the fact that at various times the defendant appeared rational.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing the withdrawal of a plea of guilty. Gavin W. Craig, Judge.

The facts are stated in the opinion of the court.

Gray, Barker & Bowen, and Wheaton A. Gray, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

MELVIN, J.—The defendant was charged with the murder of one Horace E. Montague, the date of the commission of the crime being December 1, 1913, and the place the county of Los Angeles. He was captured in San Francisco about three weeks after the commission of the homicide and was taken to Los Angeles. On the trip southward he freely confessed his guilt to Mr. W. A. Hammel, sheriff of Los Angeles County, and to Captain T. H. Broadhead, an employee of the Southern Pacific Company. Subsequently he was preliminarily examined before a magistrate, was held to answer, and an information duly charging him with the crime of murder was filed by the district attorney of Los Angeles County. He was arraigned upon this information, declined the offer of the court to appoint counsel in his behalf, and entered a plea of "guilty." The court sentenced him to death. Subsequently his parents having learned of his arrest and having employed counsel to represent him, a motion was made to set aside the judgment on the grounds that the court had taken no testimony and had not fixed the degree of the crime. This motion was granted and evidence was offered for the avowed purpose of aiding the court in determining the degree of the crime and its punishment. Another declared reason for offering this evidence was to enable the court, if the crime should be found to be murder of the first degree, to determine whether justice demanded the execution of the defendant or his imprisonment for life. While the court was busily engaged upon that inquiry defendant's counsel made a motion that defendant be permitted to withdraw his plea of "guilty" and enter a plea of "not guilty." It was also suggested that the court should consider the testimony for the purpose of aiding in the determination of the question whether or not the defendant's then present condition demanded the submission to a jury of the question of his sanity at that time.

After considering the evidence offered, which included a transcript of the testimony given at the preliminary examination and some additional testimony, the court denied defendant's motion; found the murder to be of the first degree; and pronounced upon defendant the judgment of death. Defendant appeals from the judgment and from the order denying his motion to be permitted to withdraw the plea of "guilty" and to substitute therefor a plea of "not guilty."

The defendant boarded a southbound passenger train of the Southern Pacific Company near El Monte in Los Angeles County on the evening of December 1, 1913, about 8:30 o'clock, and proceeded to rob eight people who were in the rear Pullman coach at the time he entered it. He was armed with a revolver which he used to emphasize and enforce his demands for valuables. He wore no mask or other disguise. J. W. Compton, the Pullman conductor, testified that the defendant stood near the middle of the rear Pullman coach. As he started to pass defendant, whom he regarded as a passenger, the latter seized him; presented a pistol at his breast; ordered him to throw up his hands; and when he had complied with the command, proceeded to rifle his pockets. The defendant next turned his attention to the passengers, taking valuables from three women and one man. The defendant then asked Robbins, a brakeman, where the train was and the latter, besides giving the desired information, said that unless he should give a signal the train would stop there. Defendant ordered him to give the signal to go ahead and Robbins went out on to the platform where he signaled the engineer to stop. Thereupon the defendant went after the brakeman, called him a vile name and said he had a good notion to blow Robbins's brains out. Robbins was compelled at the point of the revolver to give the signal for the train to proceed. Then defendant forced Robbins to re-enter the car and take a seat. He then said to Robbins "I will take your watch just to learn you a lesson." This he proceeded to do, remarking "I don't often do this" and reiterating the statement that his act was just to "learn" Robbins a lesson. At this moment Montague entered the car and walked down the aisle toward the place where defendant was standing. The defendant seized Mr. Montague with his left hand pointed the revolver at the breast of that gentleman with

his right hand, and said ''Throw up your hands!''  Montague replied, ''What?''  The command was repeated, but Montague caught at defendant's left wrist with his left hand, whereupon defendant drew his victim toward him and fired, mortally wounding Montague, who dropped his valise, turned and ran up the aisle from a point near the end to about the center of the car when a second shot was fired by the defendant in the direction of the fleeing man, but it did not strike him.  He fell near the door of the car.  The defendant remarked ''I guess one of them got him,'' and told the others in the car that what they had seen was only a ''lesson'' of what they would get if they made any move.  He then forced Robbins to give the signal for the train to slow down, and when it was progressing at the rate of about fifteen miles an hour, defendant jumped off and escaped. . Montague died before the train reached Los Angeles, which was about thirty minutes after the shooting.  The other witnesses corroborated Compton in all essential particulars.  Robbins, the trainman, told of defendant's entering the wash room at the end of the car where the witness and a Mr. Colen were relieved of their valuables by the robber.  He then drove Robbins and Colen in front of him into the main body of the car.  He next took some of Mrs. Colen's property, including a diamond ring, threatening to shoot her if she would not readily yield up her money and jewelry.  But it is unnecessary to go into the details of Robbins's testimony as it did not differ in any essential point from that of Compton.  His description of the actual encounter and the shooting of Montague was as follows: ''He took my watch.  Just a few seconds after Mr. Montague come in the front end of the car and walked through quickly, walked right up to the defendant.  The defendant stopped him and grabbed him by the lapel of the vest or coat and demanded him to throw up his hands.  Mr. Montague says, 'What?'  He says, 'Throw up your hands.'  Mr. Montague says, 'Not by a damn sight,' and dropped his grip he had in his right hand and made some move, I could not see, as Mr. Montague was standing between me and the defendant, back to me, but at the same time this move was made a shot was fired.  Mr. Montague turned, run down the aisle, and when about half way down the defendant fired another shot.

"Q. In what direction? A. Toward Mr. Montague.

"Q. What did the defendant say, if anything?

"A. I heard him make a remark that one of them got him anyway. That is all the remark I heard him make. He stood there probably two minutes or a little more, did not say anything till he demanded me to go and stop the train till he got off. I went out and gave a stop signal. He stood on the platform and demanded me to stand on the other side from where he was. I stood over as far as I could. The gun was still pointed at me and I asked him for my watch. The train then slowed down to about 15 miles an hour. The defendant jumped off."

The first contention of defendant's counsel is that the court abused its discretion in not granting the motion that defendant be permitted to withdraw his plea of guilty. He calls our attention to the fact that the defendant was not represented by counsel at the time his plea was entered and insists that the proof of insanity should have raised such doubt in the mind of the judge as would have impelled him under his oath to submit the question of defendant's mental condition at the time of the homicide to a jury. The record shows, however, that upon the arraignment of the defendant the court carefully explained his rights to him. He was told that if he desired to be represented the court would appoint counsel who would act for him without compensation; that he was entitled to a trial in open court by a jury and to the process of the court to procure witnesses to testify in his behalf.

The question of the mental condition of the defendant and whether or not the evidence was such as to warrant the submission of that matter to a jury was one addressed peculiarly to the conscience of the judge as well as to his observation. He saw the defendant and the witnesses. He heard their testimony and was in a position to weigh it. The defendant's father testified by affidavit and personally that the young man was "weak minded, mentally incompetent and in fact insane," basing his conclusions largely upon the son's habit of running away from home; upon his addiction to theft; and upon the frequent recurrence, from early childhood, of sullen spells during which the defendant would refuse for long periods to speak to any member of the family. Other witnesses gave similar testimony, based upon almost identical

reasoning, that in the opinion of each of them the defendant
was insane.  Dr. Pepper who had examined the defendant
and had gleaned as much of his history as possible from the
young man's statements and from other sources, including
the report of the testimony taken at the preliminary exam-
ination, stated in reply to a long question containing a synop-
sis of the testimony, that, basing his conclusion upon the
facts related to him and upon the personal examination which
he had given the defendant, it was his opinion that the latter
was suffering from a condition of insanity which the doctor
characterized as "aggravated kleptomania."

For the prosecution Doctors Orbison and Allen who had
examined the defendant and had obtained as much of his
family history as possible from the young man himself, each
testified that defendant's mental condition was very good
and that he was not insane.   Others testified that at various
times, including the occasion of the robbery, defendant ap-
peared rational.

Appellant's counsel cite *People* v. *McCrory*, 41 Cal. 461,
in support of their belief that the court erred in denying
their motion, but the facts in that case are so totally different
from those presented in the one at bar that the cited authority
does not support the position taken by counsel.   In the Mc-
Crory case the court had erroneously denied a motion for
a continuance of the trial to the next term because of the
absence of material witnesses.   Rather than go to trial on
the charge of murder without his witnesses the defendant
withdrew his plea of "not guilty" previously entered and
pleaded "guilty" to murder of the second degree.   The court
refused to permit this plea to be withdrawn, and that was
held to be an abuse of discretion.

In *People* v. *Scott*, 59 Cal. 341, the facts were also very
different from those displayed by the record before us in
this case.   Scott had been declared insane by a jury after
his plea of "guilty" and had been a patient in the Insane
Asylum at Napa.   Upon his discharge from that institution
the court sentenced him after denying his motion for leave
to withdraw his plea.   The substance of the affidavits in
support of the plea is not fully given in the opinion, but
it does appear that they were numerous and "tended to show
that the defendant had not been of sound mind for several

years and that he was at one time an inmate of the Insane Asylum at Jacksonville, Ill.'' It was held that ''under the peculiar circumstances of the case'' the court erred in refusing to permit the withdrawal of the plea.

It is asserted by counsel for the appellant that the lower court erred in announcing that there was no evidence of insanity in the case ''in the teeth of the testimony of three disinterested witnesses that the boy was irresponsible and insane, the testimony of the father and brother to the same fact, and the testimony of a competent expert witness that in his opinion the boy was entirely irresponsible at the time he committed the crime.'' But the facts upon which these witnesses based their opinions were as consistent with sanity as with a disordered state of the mind. Some sane people steal. Some sane people have moody periods at times and many sane boys run away from home. The expert witness who testified in defendant's behalf stated that when he examined defendant the young man was rational and normal and that in the opinion of the witness he knew the difference between right and wrong. The physician's conclusion that when the train robbery occurred the defendant was afflicted with ''aggravated kleptomania'' was based upon facts, so far as the evidence shows, which merely revealed a lack of honesty on the part of the defendant. We cannot say that the judge who heard these witnesses was mistaken in asserting that there was no evidence of defendant's insanity.

Undoubtedly a court should permit a plea of ''guilty'' to be withdrawn and one of ''not guilty'' to be substituted where it properly appears that the former plea was ignorantly induced or was made through motives of hope or fear unduly operating upon the defendant's volition. (*People* v. *Miller,* 114 Cal. 16, [45 Pac. 986].) But where, as in this case, the plea of guilty was made and entered under circumstances which showed that the accused person was neither surprised nor cajoled, we cannot say that the discretion vested in the trial court under section 1018 of the Penal Code, was abused. The court must be upheld in the exercise of such sound discretion unless abuse of discretion is clearly shown. (*People* v. *Dabner,* 153 Cal. 403, [95 Pac. 880].)

The murder was committed in the perpetration or attempt to perpetrate robbery, and was therefore murder of the first

degree.  (Pen. Code, sec. 189.)  There was some contention in
the briefs and at the oral argument of this case that this
section meant to apply only to such a murder as would be
included in the scheme of robbery and planned as a part of
the execution of that crime.  A mere statement of such a
theory carries its refutation, for it must be apparent that
without reference to the robbery such a murder would be a
"willful, deliberate and premeditated killing."  In one of
their briefs counsel, referring to defendant, use this language:
"His evident purpose, whether he was sane or insane, was
simply to accomplish robbery.  He had no deliberate inten-
tion and design of taking human life.  The taking of human
life was forced upon him by the unwise resistance of Mon-
tague.  And it may very well be that the actual killing of
Montague was the result of the accidental discharge of the
pistol in the course of the scuffle, which scuffle and resistance
on the part of Montague appears to have taken place, accord-
ing to the testimony of three disinterested witnesses."  Even
if it be conceded that Montague was killed by an accidental
discharge of the revolver which occurred during the struggle,
the defendant would be guilty of murder of the first degree.
The moment he entered that car with a deadly weapon in
his hand, with the purpose of committing robbery, the law
fixed upon him the intent which would make any killing in
the perpetration of the robbery or in the attempt to perpe-
trate it, a murder of the first degree.  In such cases the law
does not measure the delicate scruples of the robber with
reference to shooting his victim.  The law holds him highly
guilty if he does kill and it makes no difference whether he
strikes down a man, as did Dabner and Siemsen, presumably
upon the theory that "dead men tell no tales," or slays the
brave man who resists, as did Montague.  In either case, he
is a murderer subject to the finding of the jury upon trial
or of the court after a plea of "guilty," that he shall suffer
death or imprisonment for life.  But there was evidence
which would abundantly justify the court in finding not
that the revolver exploded in the struggle, but that the de-
fendant deliberately took Montague's life, because after the
dying man was in full retreat the defendant sent a second
bullet flying in his direction and then remarked that "one of
them got him anyway."  It was an atrocious crime and we

can perceive no reason why the court was not justified in pronouncing the sentence which was given.

The court permitted certain witnesses to testify to the fact that at various times the defendant appeared rational. This was proper. (*People* v. *McCarthy,* 115 Cal. 260, [46 Pac. 1073] ; *People* v. *Manoogian,* 141 Cal. 596, [75 Pac. 177].)

There was a substantial compliance with section 987 of the Penal Code when the defendant was taken into court for arraignment. While he was not informed in the exact language of the statute that he was entitled to have the aid of counsel "before being arraigned," he was told that the court was ready to appoint a legal adviser who would serve without compensation. He had not then been arraigned and the court's readiness to appoint counsel then was sufficient notice to him that he was entitled, if he so wished, to the aid of counsel at all stages of the prosecution against him. The court explained with scrupulous care that he might have two days between arraignment and plea if he so desired. No advantage was taken of him and he was given every fair opportunity allowed by statute for obtaining legal advice and for time to deliberate upon the course to be pursued by him.

The judgment and order are affirmed.

Henshaw, J., Shaw, J., Sloss, J., Lorigan, J., and Angellotti, J., concurred.