STATE, RESPONDENT *v.* REAGIN, APPELLANT.

(No. 5,086.)

(Submitted September 27, 1922. Decided October 19, 1922.)

[210 Pac. 86.]

*Criminal Law—Homicide Committed in Perpetration of Robbery—Murder in First Degree—Defenses—Intoxication—Instructions.*

Criminal Law—When Offer of Instruction Properly Refused as Inapplicable to Facts.
1. Unless an offered instruction is applicable to the facts presented by the evidence, its refusal is not error.

Homicide—Instructions—Proper Refusal.
2. Where the evidence showed that defendant had planned to commit robbery by taking personal property from the custody of an officer who had seized it as stolen property, an instruction offered on the theory based on sections 10865 and 10894, Revised Codes of 1921, that he had merely committed a misdemeanor in attempting to take and destroy evidence, and therefore could not be held guilty of murder in the first degree in the absence of a showing of premeditation, deliberation and malice, was properly refused as not applicable to the evidence.

Homicide Committed in Perpetration of Robbery—Murder of First Degree.
3. Where homicide is committed in the perpetration of or attempt to perpetrate robbery the result is murder in the first degree (Rev. Codes 1921, sec. 10955), irrespective of the absence of intent in the accused to commit the latter crime, it being sufficient for conviction if he was capable of entertaining the felonious intent to commit robbery.

Same—Intoxication—Verdict Conclusive, When.
4. Where the question whether defendant was so far under the influence of intoxicating liquor that he could not entertain the

---

4. Intoxication as a defense to burglary, see notes in **Ann. Cas.** 1913C, 521; 36 **L. R. A.** 469; **L. R. A.** 1918A, 1168.

necessary criminal intent to commit robbery in the perpetration of
which he committed homicide was fully and fairly presented, with
instructions tendered by defendant himself, and there was ample
evidence to justify the conclusion of the jury that he was able
to entertain such intent as evidenced by their verdict, the ques-
tion of intoxication is eliminated from consideration on appeal.

Same—Robbery—Ownership and Possession of Property—Evidence—
Sufficiency.
5. As against defendant, who did not claim to be the owner of
personal property he was attempting to take from the custody of
an officer, possession by the officer was sufficient evidence of his
right to its possession to support the charge of robbery.

Same—Accidental Discharge of Firearm No Defense.
6. That accused unintentionally discharged the gun with which
he "held up" deceased in his attempt to commit robbery was no
defense in a prosecution for murder.

Same—Degrees of Homicide—Instructions—Failure to Tender—Effect.
7. In a prosecution for murder in the first degree, appellant may
not complain of the failure of the court to instruct on the sub-
jects of manslaughter or murder of the second degree in the ab-
sence of an offer by him of instructions on those subjects.

Same—When Court not Required to Instruct on Degrees of Homicide.
8. Murder committed in the perpetration or attempt to perpetrate
robbery, burglary, *etc.*, is murder of the first degree, and murder
so committed is not divisible into degree; hence the court need
not in such a prosecution instruct as to murder of the second
degree or manslaughter.

*Appeals from District Court, Treasure County; Geo. A.
Horkan, Judge.*

JOE B. REAGIN was convicted of first degree murder and
appeals from the judgment and from an order refusing a new
trial. Affirmed.

*Messrs. Guinn & Maddox* and *Mr. H. G. Young*, for Appel-
lant, submitted a brief; *Mr. C. C. Guinn* and *Mr. Young* argued
the cause orally.

By the failure of the court to instruct on second degree
murder and manslaughter the defendant was deprived of the
right to have all of this evidence determined by the jury
under proper instructions. If the evidence discloses even to
the slightest extent any of two degrees of murder or of man-
slaughter, defendant is entitled to instructions on all those
degrees and on that of manslaughter. "Where there is
evidence tending to show defendant guilty of murder in the

[64 Mont. 481.]

first degree, of murder in the second degree, and of manslaughter, it is the duty of the court to instruct explicitly that a verdict of manslaughter may be returned, manslaughter not being a degree of murder." (*State* v. *Shadwell*, 26 Mont. 52, 66 Pac. 508; *State* v. *Calder*, 23 Mont. 504, 59 Pac. 903; *State* v. *Fisher*, 23 Mont. 540, 59 Pac. 919; *State* v. *Howell*, 26 Mont. 3, 66 Pac. 291; *Territory* v. *Lynch*, 18 N. M. 15, 133 Pac. 405.)

"It is the duty of the trial court to charge on manslaughter if there is any reasonable evidence that the killing might have been done under circumstances that would reduce the crime to manslaughter." (*Ryan* v. *State*, 8 Okl. Cr. 623, 129 Pac. 685; *Palmer* v. *State* (Okl. Cr.), 187 Pac. 502.)

The evidence has a tendency to. show, from defendant's confession and from the statements of other eye-witnesses, either that the defendant, at the time of the commission of the crime, was acting willfully, deliberately and premeditatedly, with malice aforethought, or that he was attempting to commit a robbery, or that he was committing some other crime not classed as a felony, and that in committing this other crime he had no intention of killing the deceased, but that he handled the weapon in his hand in a very careless and negligent manner, but without malice. "The negligent handling of a loaded firearm causing or contributing to the death of another person is manslaughter within the meaning of section 10959, Revised Codes of 1921." (*State* v. *Kuum*, 55 Mont. 436, 178 Pac. 288.)

*Mr. Wellington D. Rankin*, Attorney General, and *Mr. L. A. Foot*, Assistant Attorney General, for the State, submitted a brief; *Mr. Rankin* argued the cause orally.

Appellant was either guilty of murder in the first degree or he was not guilty, and there was no necessity for the court to instruct the jury relative to murder in the second degree or manslaughter. (21 Cyc. 1067; *State* v. *Murray*, 126 Mo. 526, 29 S. W. 590; *State* v. *Barrett*, 40 Minn. 77, 41 N. W.

463; *People* v. *Vasquez,* 49 Cal. 560; *People* v. *Bostic,* 167
Cal. 754, 141 Pac. 380; *State* v. *Mewhinney,* 43 Utah, 135,
Ann. Cas. 1916C, 537, L. R. A. 1916D, 590, 134 Pac. 632–638;
*Ray* v. *State,* 10 Okl. Cr. 403, 136 Pac. 980.)

To entitle defendant to complain of the failure of the trial
court to instruct on a certain point, he must have offered an
instruction on that point. (*State* v. *Francis,* 58 Mont. 659,
194 Pac. 304; *State* v. *Powell,* 54 Mont. 217, 169 Pac. 46;
*State* v. *Gordon,* 35 Mont. 458, 90 Pac. 173; *Territory* v.
*Manton,* 8 Mont. 95, 19 Pac. 387; *Territory* v. *Hart,* 7 Mont.
489, 17 Pac. 718.)

MR. JUSTICE HOLLOWAY delivered the opinion of the
court.

Joe B. Reagin was convicted of murder in the first degree,
and has appealed from the judgment and from an order deny-
ing him a new trial.

Some time late in the fall of 1921 the residence of a
Mrs. Gambol, in Treasure county, near McRae postoffice, was
burglarized, and bedding and other household articles taken.
On December 9 the sheriff of Treasure county and Irv-
ing Keeler, the under-sheriff, went to the Gambol neigh-
borhood to search for the stolen property, and, with a son
of Mrs. Gambol, searched about the premises of Amanda
J. Bolton, and later in the day searched the premises of Glen
Bolton, where they discovered several articles which the Gambol
boy identified as property which had been taken when his
mother's residence was burglarized. At the time Mrs. Glen
Bolton was confined to a bed in her home on account of a
broken leg. The sheriff placed Keeler in possession of the
property identified by Gambol, and secured Samuel Pope to
remain at the Bolton home with Keeler. The sheriff then
returned to Hysham to secure a warrant, presumably for Glen
Bolton, and medical attention for Mrs. Bolton. After the·
sheriff had gone, Glen Bolton went to the home of a neighbor
to secure some camphor for his wife. He returned about 10

[64 Mont. 481.]

o'clock at night, and soon thereafter this defendant appeared, wearing a mask over his face and armed with a revolver. As he entered the house and the doorway leading into the room where Glen Bolton, Mrs. Bolton, Keeler and Pope were assembled, he presented the revolver with the hammer cocked and commanded the four persons named to throw up their hands. Bolton and Pope obeyed promptly, but Keeler either refused or hesitated, and was shot and killed. After the shooting defendant burned the articles which Keeler had been guarding, took Keeler's gun, Glen Bolton's gun and his own, and left, but was later apprehended. The foregoing facts are taken from the case made by the state. Other evidence introduced by the prosecution need not be narrated here.

The defendant took the witness-stand in his own behalf, and apparently in the most *naïve* manner imaginable told the story of his participation in the homicide, and included as well a recital of his complicity in other crimes. Stated briefly, his story is to the following effect:

He was born in Oklahoma and reared there until he was about fifteen years old, when he came to Montana and resided here for some time. For brief intervals he was in Texas, New Mexico, Washington, Wyoming and California, in which last-named state he committed grand larceny and pleaded guilty to the offense. He returned to Montana and engaged in work near Hardin until the fall of 1921, when he went to Treasure county near McRae postoffice and worked a few days for a Mr. Dowlin. He then took up his abode at the home of Glen Bolton in the same neighborhood. The Boltons not having sufficient bedding to accommodate him adequately, he burglarized the home of Mrs. Gambol at the instigation of Glen Bolton, and secured the necessary articles, which he took to the Glen Bolton home, where they were used. He did not do any work, except to assist about the chores. When the supply of meat at the Bolton home became exhausted, he went upon the range, butchered a steer without consulting the owner, and replen-

ished the larder, and when that supply was consumed he repeated the crime, and again provided the necessary food.

During the afternoon of December 9, while he was at the home of Amanda J. Bolton, he was informed that the sheriff and under-sheriff were in the neighborhood searching for the goods which had been taken from the Gambol residence. He started to return to the home of Glen Bolton about dark, and on the way met Glen Bolton, who informed him that an officer was then in the Bolton home in charge of property which had been taken from the Gambol residence. The two of them then agreed that defendant should ''hold up'' the under-sheriff, and that they would disarm him and take the goods from him and burn them, thereby, as they supposed, destroying the evidence of the burglary. In the conversation defendant asked Bolton if the officer in his house ''was a mean-looking guy, if he looked like he would be hard to hold up,'' to which Bolton replied, ''No, just a little guy; an ordinary town dude.'' Bolton said further: ''Don't cause any trouble if you can help it, but if you do I'll get you out of it.'' In execution of their plan they returned to the Amanda J. Bolton home, where they secured a large handkerchief and a piece of cloth for a mask. They then went to a point near the Glen Bolton home, where it was agreed that defendant should wait until Bolton went to his home and informed Mrs. Bolton and Pope of what was to occur, so that they would not be unduly excited. Defendant waited until he thought that sufficient time had elapsed for Bolton to make all necessary arrangements, and he then went to the house, his face, except his eyes, covered by the mask.

As he entered the house he drew and cocked his revolver, and approaching to the doorway leading into the room where Bolton, Mrs. Bolton, Pope and Keeler were gathered, he called out in a loud voice: ''Easy men. Stick 'em up quick.'' Bolton and Pope each put up his hands. Keeler was sitting with his legs crossed and his hands locked over his knees. He put his foot down, and cleared his throat, as if to say something,

when defendant drew his gun down on Keeler, the gun was discharged, and Keeler was killed. Defendant testified: "I didn't know I was pressing the trigger." He testified, also, that he did not intend to kill Keeler; that he had been drinking, and was somewhat under the influence of intoxicating liquor.

There is much more evidence in the record, but nowhere does it present any conflict upon a material matter, and the foregoing suffices to illustrate defendant's assignments of error.

1. Complaint is made of the refusal of the trial court to [1, 2] give defendant's offered instructions 9 and 10, as follows:

"(9) The court instructs the jury that every person who willfully injures, or takes or attempts to take, or assist any person in taking or attempting to take, from the custody of any officer or person any personal property which such officer or person is in charge of under any process of law, is guilty of a misdemeanor.

"(10) Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing is about to be produced in evidence upon any trial, inquiry, or investigation whatever authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor."

Offered instruction 9 includes all of section 10865, Revised Codes of 1921, while offered instruction 10 is a literal copy of section 10894. The theory upon which these instructions were offered is that, if the homicide occurred while defendant was committing or attempting to commit a misdemeanor only, he could not be guilty of murder in the first degree, in the absence of proof of premeditation, deliberation and malice aforethought, and that defendant had the right to have his theory presented to the jury with appropriate instructions defining murder in the second degree and manslaughter. It will be conceded at once that defendant was entitled to have his theory of the case presented, provided there was any evidence fairly tending to support it. However, a party cannot suggest an

imaginary state of facts, and then demand that the court instruct the jury as to the law applicable to such imaginings. The instructions must naturally arise from and be called forth by the facts disclosed by the evidence. (*Territory* v. *McAndrews,* 3 Mont. 158.)

Section 10894 has no application whatever to the facts presented by this record. There is not a suggestion in the evidence that defendant knew that the articles in the possession of Keeler were about to be produced in evidence upon any trial, inquiry, or investigation; indeed, he could not know that they would be so used, since no legal proceedings had been taken in the burglary matter, so far as disclosed by the record. But, furthermore, the homicide was not committed while defendant was destroying or attempting to destroy the property. According to his own story, he undertook, with Bolton's assistance, to "hold up" Keeler and take the property from him, and it was while he was engaged in that undertaking that Keeler was killed. It is true that the ultimate purpose was to destroy the property to prevent it being used as evidence; but the fact remains that the homicide was committed while defendant was attempting to take the property from Keeler. If the attempt to take it in the manner so graphically described by the defendant amounted only to a misdemeanor, then it follows, as of course, that offered instruction 9 should have been given, and the refusal to give it constituted reversible error. But the fault in the argument of counsel for defendant is in the assumption that the taking of personal property from the possession of an officer under the circumstances disclosed by the testimony of the defendant himself amounts only to a misdemeanor.

Section 10973 declares that the felonious taking of personal [3, 4] property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear, is robbery. If Keeler had submitted to the persuasive influence of defendant's revolver, and the property had been taken under the circumstances disclosed,

there could not be a doubt that the resulting crime would have been robbery, unless the defendant was so far under the influence of intoxicating liquor that he could not entertain the necessary criminal intent. Section 10728, Revised Codes of 1921, provides: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his being in such a condition. But, whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

It is altogether immaterial whether defendant intended to commit murder if the homicide was committed in the perpetration or attempt to perpetrate robbery. If he was capable of entertaining the felonious intent to commit robbery, and in pursuance of that intention and while carrying it into execution he killed Keeler, he is guilty of murder of the first degree, for under such circumstances the elements of deliberation and premeditation do not enter into consideration, and the malice necessary to characterize the killing as murder is to be implied from the fact that no provocation for the killing appeared. (Sec. 10954, Rev. Codes 1921.)

Whether defendant was so under the influence of liquor was presented fully and fairly, with instructions upon the subject tendered by defendant's counsel, and by the verdict the jury declared that he was able to and did entertain the necessary criminal intent. Since the evidence amply justifies that conclusion, the question of his intoxication is eliminated from further consideration.

It is suggested that the crime, upon the commission of which [5] defendant was engaged at the time Keeler was shot, was neither robbery nor attempt to commit robbery, and this upon the theory that Keeler was not the owner of the property. While it is true that Glen Bolton had laid claim to the property, defendant knew that it had been stolen, and as against

him, who made no claim to it, the possession of the under-sheriff was sufficient evidence of his right to possession (*State v. Howard*, 30 Mont. 518, 77 Pac. 50; 34 Cyc. 1810), and the fact that Keeler was an officer did not change the character of defendant's offense. The crime of robbery was not completed before the fatal shot was fired, but the acts done by the defendant toward its commission constituted an attempt to commit robbery. Section 11590, Revised Codes of 1921, provides: "An act done with intent to commit a crime, and tending but failing to effect its commission, is an attempt to commit that crime."

Having determined that the homicide was committed in an attempt to perpetrate robbery, it follows that the major crime actually committed was murder of the first degree, for section 10955, Revised Codes of 1921, declares, among other things, that all murder committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem is murder of the first degree. Section 10865 has no reference to a taking accomplished by means of force or fear, and the court did not err in refusing to give the offered instructions 9 and 10.

2. Neither is it of any consequence that, according to defendant's version, the revolver was discharged unintentionally. [6] He must accept responsibility for the consequences of his acts while engaged in this criminal undertaking. In *People v. Bostic*, 167 Cal. 754, 141 Pac. 380, the general rule applicable in such cases is stated as follows: "Even if it be conceded that Montague was killed by an accidental discharge of the revolver which occurred during the struggle, the defendant would be guilty of murder of the first degree. The moment he entered that car with a deadly weapon in his hand, with the purpose of committing robbery, the law fixed upon him the intent which would make any killing in the perpetration of the robbery, or in the attempt to perpetrate it, a murder of the first degree. In such cases the law does not measure the delicate scruples of the robber with reference to shooting his victim. The law holds him highly guilty if he does kill."

[64 Mont. 481.]

3. Counsel for defendant did not tender an instruction upon
[7, 8] the subject of murder in the second degree or man-
slaughter, and for this reason alone are not entitled to be
heard to complain of the court's failure to charge upon either
subject; but we do not rest our decision upon that ground.
It is the rule, quite uniformly recognized and enforced, that
where, as in this state, the absence of actual preconceived de-
sign to take human life does not reduce the grade of the crime,
if the homicide was committed in the perpetration or attempt
to perpetrate arson, rape, robbery, burglary or mayhem, the
court need not instruct as to other offenses included under the
general definition of murder (*State* v. *Mewhinney,* 43 Utah,
135, Ann. Cas. 1916C, 537, L. R. A. 1916D, 590, 134 Pac. 632;
*Ray* v. *State,* 10 Okl. Cr. 403, 136 Pac. 980; 21 Cyc. 1067),
and the reason for the rule is manifest. The statute declares
that murder committed in the perpetration or attempt to
perpetrate robbery is murder of the first degree, and mur-
der so committed is not divisible into degrees. There
is not, in this record, any evidence to which a charge con-
cerning murder of the second degree or manslaughter could
apply; hence the court did not err in failing to instruct upon
either subject. (*State* v. *Calder,* 23 Mont. 504, 59 Pac. 903.)

The unfortunate situation in which defendant finds himself
results from his own testimony as much as from the testimony
produced by the state. Out of his own mouth he convicted
himself and no jurors responsive to their official oaths could
have returned a verdict different from the one upon which
defendant was adjudged to pay the extreme penalty provided
by law.

Neither the judgment nor the order is open to any of the
attacks made upon it, and accordingly each is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES FARR, COOPER and GALEN concur.

Rehearing denied November 14, 1922.