Argued December 17; Reversed and Remanded January 27;
Rehearing Denied March 2, 1948

# STATE *v.* WILSON

189 P (2d) 403

*Edward C. Kelly,* of Medford, argued the cause and filed a brief for appellant.

*George W. Neilson,* District Attorney, of Medford, argued the cause for respondent. With him on the

brief was Allison Moulton, Deputy District Attorney, of Medford.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and WINSLOW, Justices.

BAILEY, J.

Defendant, Forrest Wilson, was indicted for the crime of murder in the first degree committed in attempting to perpetrate the crime of robbery. The indictment more specifically alleges that defendant, in Jackson county, Oregon, on the 10th day of November, 1946, "did commit an assault upon John B. Camden, with intent, if resisted, to kill or wound the said John B. Camden, and while attempting to feloniously take money and other personal property from the person of the said John B. Camden against his will, in attempting to commit said robbery, by his act, killed the said John B. Camden by shooting him, the said John B. Camden, with said shotgun * * *." The jury found defendant guilty of first degree murder as charged in the indictment and recommended life imprisonment. From the judgment, entered thereon, sentencing him to life imprisonment in the state penitentiary defendant has appealed.

Defendant's first assignment of error is based upon the refusal of the trial court to instruct the jury as requested by him "as to the degrees of homicide under the statutes of Oregon."

The following sections of O. C. L. A. are pertinent to the consideration of this assignment. Section 23-401: "If any person shall purposely, and of deliberate and

premeditated malice, or in the commission or attempt to commit any rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the first degree." Section 26-947: "Upon an indictment for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment, and guilty of any degree inferior thereto, or of an attempt to commit the crime or any such inferior degree thereof." Section 26-948: "In all cases, the defendant may be found guilty of any crime, the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit such crime."

■ Under the two sections last above-quoted, an indictment for murder in the first degree "necessarily involves all other grades of homicide which the evidence tends to establish." *State v. Farnam,* 82 Or. 211, 214, 161 P. 417; *State v. Nortin,* 170 Or. 296, 133 P. (2d) 252.

■■ It is a well-established rule that the court, when requested by defendant, must in its instructions cover every degree of homicide included in the indictment where the evidence and circumstances are such that different inferences or conclusions may properly be drawn therefrom as to the degree. And where the evidence is sufficient to raise a doubt, however slight, as to whether the homicide is one of two or more degrees, the court must charge on all such degrees. 26 Am. Jur., Homicide, § 554, p. 542; 41 C. J. S., Homicide, § 389-b, p. 201; *State v. Ellsworth,* 30 Or. 145, 47 P. 199; *State v. Clark,* 99 Or. 629, 655, 196 P. 360; *State v. Sing,* 114 Or. 267, 283, 229 P. 921; *People v. Lunse,* 278 N. Y. 303, 16 N. E. (2d) 345; *Jackson v. State,* 133 Neb. 786, 277 N. W. 92. Under what appears to be

the weight of authority the court is required to give such instructions although not specifically requested. 26 Am. Jur. 542.

■■ The decisions are not in harmony on the question of the right of the jury to find a defendant guilty of a lesser degree of homicide when he has been charged, pursuant to statute, with first degree murder committed in the perpetration or attempted perpetration of rape, arson, robbery or burglary. However, the majority rule, supported by the better reasoned adjudication, is to the effect that in such cases the jury has the right to find the accused guilty of some less degree of homicide than first degree murder, and that under the conditions and circumstances hereinbefore mentioned the jury should be instructed relative to the different degrees of homicide. 26 Am. Jur., Homicide, § 573, p. 561; Anno., 12 Ann. Cas. 1081, Ann. Cas. 1916 C, 556, 12 L. R. A., N. S. 935; *State v. Ellsworth,* supra. This court is in accord with the foregoing majority rule. Where, however, the evidence of a homicide shows that it was committed in the perpetration of, or in an attempt to perpetrate, one of the felonies enumerated in the statute defining murder in the first degree, and not otherwise, an instruction on the different degrees of homicide is improper. *State v. Mewhinney,* 43 Utah 135, 134 P. 632, L. R. A. 1916 D, 590, Ann. Cas. 1916 C, 537; Anno., 21 A. L. R. 628, 27 A. L. R. 1100, 102 A. L. R. 1030.

Apparently the district attorney does not seriously, if at all, question the correctness of the rules hereinbefore enunciated. He does, however, strenuously argue that there is no evidence whatsoever tending to establish guilt of any particular degree of homicide less than first degree murder and that, therefore, it would have been improper for the court to have instructed

the jury concerning the inferior degrees of homicide. In support of this principle of law, which is not questioned, he cites the following authorities: *State v. Mewhinney,* supra; *State v. Mowry,* 37 Kan. 369, 15 P. 282; *State v. Reagin,* 64 Mont. 481, 210 P. 86; *State v. Gottstein,* 111 Wash. 600, 191 P. 766.

The question, therefore, is whether different inferences or conclusions may properly be drawn from the evidence and circumstances as to the degree of homicide. We shall now briefly discuss the evidence. From about 5 o'clock, p. m., on November 9, 1946, until approximately 1 a. m. the following morning, a poker game was in progress in a small garage, which had been converted to a gaming-house, in the outskirts of the city of Medford. Defendant arrived at the garage between 10:30 and 11:30 p. m., and at once began to participate in a poker game. After losing what money he had, he borrowed $25 or $30 from John B. Camden, delivering his watch to him as security. Camden immediately handed the watch to Albin J. Fox, the house man, to keep until redeemed by Wilson. This money was also soon lost and he left the garage, according to his testimony, between 12:20 and 12:30 a. m., on November 10, and according to other witnesses, some time before 12 o'clock midnight. About 1 a. m. there were seated around the table six players and the house man. Standing inside the garage near the front door was an eighth man, Orval White, one of the owners of the game. In the rear of the garage was a ninth man, Delbert Parker, who had charge of the refreshments. We now quote from White's testimony:

> "I was standing watching this poker game there, and Johnny Camden got up from the poker table, and he went to this little door in the garage. There was a screen door latch that held that small

door shut, and he opened this door and kicked the door open. Of course, I was standing watching the poker game and paying not much attention to him, but I heard him immediately say 'Pardon me' or something like that—I don't recall exactly what it was—then I heard somebody say outside 'This is a scattergun', and I stuck my head around the door to see what was going on. I seen this man here with a shotgun; he had a handkerchief over his face like that—a red handkerchief. I pulled my head right back in the door, naturally, and he shoved the shotgun right on in. He no more than got it in until it went off. I grabbed the shotgun, and he jerked me out of the door. I wrestled with him probably fifty feet out toward Hamilton Street. He got the gun jerked away from me, and I was afraid he would get another shell in the gun, so I turned and run back into the garage. I just got in the garage and was giving the boys who were sitting at the table the devil for not getting out and helping me—when I got out in the road and when I seen he was going to get away, I hollered 'Help' couple of times, but nobody came out, so when he got away I run back in the garage. I just got inside and was giving the boys the dickens for not helping me, and he come back in with the shotgun again. I don't remember just what words he did use, but he give us to understand he wanted the money out of that game, that's what he was after. Blackie Chambers had just come in. He heard me holler when he was in the house, and he come running out into the garage. He just got in as I came in, and as soon as he seen the shotgun coming in the door behind me, he turned and run back out and turned the lights off. As soon as the lights went off, this man run out. His car was parked down the road a ways, and he got away.''

On cross-examination White gave the following testimony:

"Q. You testified at the preliminary hearing,

did you not, that this was an accidental shooting? A. No; I don't believe I did. I said it looked like an accidental shooting to me. I don't see why the man pulled the trigger. He could have got the money without shooting.

"Q. As a matter of fact, did he say anything to Camden about getting out of the way, that it was a holdup or stick-up? A. I don't think he did.

"Q. He said 'This is a scattergun'? A. He said, 'This is a scattergun'. That's the only word I heard him say."

Only one man besides White, Delbert Parker, appears to have witnessed the shooting. He testified as follows:

"Q. Tell us what you saw. A. Well, I saw him [Camden] take a step or two toward the door * * *. Then there was the door opened and somebody shoved a shotgun in there, and a shot was fired. The man fell dead.

"Q. Who do you mean by 'the man'? A. The man that was killed; and Blackie White grabbed the gun—grabbed ahold of the end of the gun, which I could only see. I didn't see the man, you understand. They went out the door and the door closed. That's the last I saw of them until it was reported the man was back again, then I went out the other door. * * *

"Q. The gun came in, and did White grab it before it was fired or afterward? A. That's something I couldn't say exactly. It was very close to the same time."

Several other witnesses heard the report of the shotgun but did not realize its source. Upon the masked man's return to the garage he was seen by most, if not all, of the men inside the garage. One of the men, John Nansen, stated that he had been drinking quite a bit and he "saw a man come to the

door with a handkerchief over his face like that, but I didn't pay no attention. I thought he played a joke on us.'' Another witness testified that when the masked man came to the garage the second time he put one foot inside the door and said ''Stay put''. Another said that he saw the masked man when he came to the garage the second time, and all he heard him say was ''Quiet'' and ''Don't move''. Fox, who was supervising the playing and who had two or three hundred dollars in his possession belonging to the proprietors, testified that he was not positive of the exact words used but he thought he said, '' 'Stick 'em up; this is a holdup' or 'Stay put'.''

Immediately after the masked man left the second time the city police of Medford and the sheriff of Jackson county were notified of the shooting. Joe Cave, the night chief of police, stated that he arrived at the garage at 1:20 a. m. and that while he was outside talking to Albert Gillette ''a car drove up out in Hamilton Street, parked about in front of the house, and a man got out and came over, and he walked up to me and said 'What is this, a raid?', and I said 'What are you doing here?'; he said earlier in the evening he had been engaged in a poker game in there and had lost his money and also his wrist watch, and that he had come back to tell the man to hold his watch until he could redeem it. I then asked him his name; he replied 'Wilson'; where he lived; he said 'Buckshot Hill'; then he said 'If there is some trouble here, I will be going'; I then detained him—told him no, there was trouble, and that I was holding everyone there for the time being. We then went to the garage.'' Cave then testified that as Wilson entered the garage, White saw him and exclaimed, '' 'That's the man there.

You have the right man, Officer'.'' He further stated that Wilson denied that he had ''killed anybody''.

On the 14th of November, after Wilson had been arraigned and returned to his cell, Don L. Cruse, deputy sheriff of Jackson county, had a conversation with him. We quote from Cruse's testimony as follows:

'' * * * I asked him how come he would stick his neck out like that, because he knew he was on parole; that I couldn't figure it out. I said 'Why don't you tell me about it?' He said 'Well, you don't think I am crazy, do you, because this place is all wired with dictaphones. I can't tell you anything.' I said 'It isn't wired', so he turned around. He was pacing the floor a little bit. I said 'You might as well tell me how it happened'. He said 'I maintain the boy would never been killed if Blackie White had never grabbed the gun barrel'. I said 'Just how did it happen?' He said 'Well, I don't know; I was burned up, and I went back out there, and just before I got — ' —he said he was 'arguing with myself before I got to the door' * * *. He said he was arguing with himself; that he had the gun, and he said he was arguing that he wasn't going to do it — arguing with himself. He said he was just getting ready to turn around and go back to his car, and all of a sudden the door flew open, and he said 'there he was as plain as life, and there wasn't anything else to do'. He said he went forward with the gun, and he said 'I don't know how it went off, because I had my thumb back of the hammer and my finger in front of the trigger guard.' He said 'I stuck the gun up there and the boy stepped back, Blackie White grabbed the gun barrel, and the gun went off in the boy's face'.''

The state's evidence tended to show that after the defendant left the game, somewhere between 11:30 and 12:30 that night, he went to his uncle's home, procured a single barrel shotgun and some shells be-

longing to his uncle and returned to the garage, and that after he had been frustrated in his attempt to commit robbery by someone turning off the lights, he again went to his uncle's home, replaced the gun and again appeared at the garage subsequent to the arrival of the officers.

The defendant came to Jackson county in June, 1946, and at the time the crime was committed he was living with his uncle and aunt, Mr. and Mrs. F. M. Gibson, on their farm about a mile and one-half east of the city of Medford and approximately four miles from the garage. He had not seen any of the men that he met at the garage prior to the evening in question. His defense was an alibi. He and his aunt and uncle testified that at about 1 o'clock, a. m., November 10, 1946, at approximately the time that Camden was shot, he drove up to the Gibson house, went into the bathroom, then to his own room for a few minutes and then drove away.

Defendant corroborated the statement made by the night chief of police, Joe Cave, as to what occurred and was said when he returned to the garage. He denied, however, the statement hereinbefore quoted, attributed to him by Cruse.

■ There is sufficient evidence in the case to sustain the verdict of murder in the first degree. No one argues to the contrary; therefore we shall not discuss that feature of the case at length. Since there is evidence relating to the accidental discharge of the gun, it should be noted that the law is well settled that if Camden was killed by the accidental discharge of defendant's gun while the defendant was attempting to commit robbery, he nevertheless would be guilty of murder in the first degree. The accidental discharge of

the gun under such circumstances would not lower the degree of homicide. *People v. Bostic,* 167 Cal. 754, 141 P. 380; *State v. Reagin,* supra.

Defendant argues that "it is not robbery for one who has lost money in gambling to compel by force or threats the return of money lost", and that this doctrine is especially applicable in Oregon, in view of § 64-102, O. C. L. A., which gives "to the loser the right to recover his losses". He cites in support of the foregoing contention the following: 35 A. L. R. 1461; 42 A. L. R. 741; 116 A. L. R. 997; *State v. Price,* 38 Ida. 149, 219 P. 1049, 35 A. L. R. 1458. In the Price case there is a strong dissenting opinion by the Chief Justice, with citation of cases holding contrary to the majority opinion, and in *People v. Rosen,* 11 Cal. (2d) 147, 78 P. (2d) 727, 116 A. L. R. 991, which precedes the annotation above referred to in 116 A. L. R., two of the Justices dissented. It is not, however, necessary for us to pass upon the correctness of the proposition of law referred to by the defendant for the reason that in the present case there is no evidence that defendant was seeking to recover the money which he had lost at gambling. He was asked if "Johnny Camden, the deceased, was the one who won most of the money". His answer was, "Not my money." In the cases which hold that it is not robbery to retake by force money lost in gambling, it is pointed out that in order to avail himself of that defense, the "accused must intend in good faith to retake his own property." *People v. Rosen,* supra.

Although there is substantial evidence sufficient to sustain a finding of first degree murder, nevertheless different inferences or conclusions may properly be drawn from the evidence and circumstances dis-

closed by the record as to the degree of homicide, if any, of which defendant was guilty. The court can not say, as a matter of law, that the masked man who shot and killed Camden was, at the time of the shooting, attempting to rob him.

For some undisclosed reason Camden left the poker game, went to the door, and opened it. Outside stood a masked man with a shotgun. All that this man said before shooting Camden was, "This is a scattergun." The fact that he was masked and had a firearm, which he announced was a scattergun, does not, when considered alone or in connection with the other evidence, constitute conclusive proof that he was guilty of first degree murder committed in an attempt to rob Camden, as charged in the indictment.

In the statement which it is claimed defendant made to deputy sheriff Cruse are expressions from which the jury might find that the defendant was angry at someone present in the garage where the poker game was in progress. Cruse, referring to the conversation he had with defendant, testified in part as follows: "He [defendant] said 'Well, I don't know; I was burned up, and I went back out there, and just before I got —' — he said he was 'arguing with myself before I got to the door' * * *. He said he was arguing with himself; that he had the gun, and he said he was arguing that he wasn't going to do it—arguing with himself. He said he was just getting ready to turn around and go back to his car, and all of a sudden the door flew open, and he said 'there he was as plain as life, and there wasn't anything else to do'."

One of the definitions of second degree murder is the killing of a person by another "purposely and maliciously, but without deliberation and premedita-

tion, or in the commission or attempt to commit any felony, other than rape, arson, robbery, or burglary''. There is no evidence whatsoever in the case that defendant was, at the time of shooting Camden, engaged in the commission or attempt to commit any felony other than rape, arson, robbery, or burglary. There is, however, evidence which would warrant the jury in finding that defendant killed Camden purposely and maliciously, without deliberation and premeditation. *Torres v. State,* 39 N. M. 191, 43 P. (2d) 929; 41 C. J. S., Homicide, § 393, p. 212.

Section 25-104, O. C. L. A., makes it unlawful ''for any person over the age of twelve years, with or without malice, purposely to point or aim any pistol, gun, revolver or other firearm, within range of said firearm, either loaded or empty, at or toward any other person, except in self-defense''. Section 23-406, O. C. L. A., as amended by § 1, chapter 439, Oregon Laws 1941, provides, so far as applicable here, as follows: ''If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed guilty of manslaughter''. Defendant committed an unlawful act in pointing the shotgun at Camden. If, without any intention whatever to take life, the gun was discharged, accidentally killing Camden, as claimed by defendant in his statement to Cruse, and defendant was not then engaged in the commission or attempt to commit a felony, he would be guilty of manslaughter. *State v. Trent,* 122 Or. 444, 252 P. 975, 259 P. 893.

■ In our opinion the circuit court erred in not instructing the jury on second degree murder, as defined by § 23-402, O. C. L. A., as being the killing of a person

by another purposely and maliciously but without deliberation and premeditation, and also on manslaughter, as defined by § 23-406, O. C. L. A., as amended by § 1, chapter 439, Oregon Laws 1941, in addition to instructions on first degree murder. The evidence and circumstances in the case, as disclosed by the record, are such that different conclusions and inferences might properly be drawn therefrom as to which one of those degrees of homicide, if any, defendant was guilty.

While defendant was on the witness stand and being cross-examined by the state, the following occurred:

"Q. Have you ever been convicted of a crime. A. Yes, sir, I have.

"Q. How many times?

"Mr. Kelly: I object to that, if the Court please. He can ask if he has been convicted more than once, but not how many times.

"The Court: You may answer.

"Q. How many times? A. Twice.

"Q. Where?

"Mr. Kelly: I object to that. He may show how many times, but may not inquire further. The purpose of this is for impeachment.

"The Court: He may answer.

"A. Where?

"Q. Yes. A. In San Quentin, California.

"Q. Where else? A. In Texas.

"Q. How many times were you convicted in Texas? A. Once.

"Q. And of what particular offense?

"Mr. Kelly: I object to that.

"Mr. Moulton: If he doesn't explain, I am going to put in the record.

"Mr. Kelly: Objection is made to all this line of questioning, for the reason that the district attorney is going beyond the line authorized by the

statute in reference to the impeachment of a witness.

"The Court: The Court has already ruled.

"Mr. Moulton: I have in mind the ruling of the Supreme Court in 138 Oregon.

"A. Larceny.

\* \* \* \* \*

"Mr. Moulton: While the witness is on the stand, your Honor, I desire to offer State's Exhibits 'S', 'T' and 'U', as being records of former convictions of felonies in Texas and California. I am offering them at this time for the reason it gives counsel a chance to question him further and have him explain, if he so desires.

"Mr. Kelly: I object to these, and to each of these exhibits, because the matters in there have already been developed by counsel by direct question, and that the statute provides a choice or means of proving that, either by the record itself or by question, and having selected the one method they are bound by it."

Defendant's objection was overruled and the exhibits were admitted. These exhibits are as follows: (1) State's exhibit "S". Certified copy of judgment of the superior court of the state of California for the county of Los Angeles, dated June 25, 1942, adjudging Forrest E. Wilson guilty of robbery and sentencing him to imprisonment in the state prison for the term prescribed by law. (2) State's Exhibit "T". Certified copy of judgment and sentence of the criminal district court of Dallas county, Texas, dated August 19, 1940, adjudging Fred Wilson guilty of robbery and sentencing him to serve a term of five years in the state penitentiary. (3) State's Exhibit "U". Certified copy of judgment and sentence of the criminal district court of Dallas county, Texas, dated August 19, 1940, finding Fred Wilson "guilty of the offense of

theft over $50.00'', and sentencing him to serve a term of two years in the state penitentiary.

Defendant's assignments of error 4 and 5 are based upon the overruling by the court of his objections in connection with the foregoing testimony and to the introduction of state's exhibits ''S'', ''T'', and ''U''.

Section 4-711, O. C. L. A., provides as follows:

''A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth is bad; or that his moral character is such as to render him unworthy of belief, but not by evidence of particular wrongful acts; except that it may be shown by the examination of the witness or the record of the judgment that he has been convicted of a crime.''

When defendant was asked if he had been convicted of a crime he answered in the affirmative. To the question, ''How many times?'' his counsel at first objected on the ground that he could not be asked the number of times he had been convicted. The objection was overruled and defendant stated that he had been convicted twice. When defendant was asked where he had been convicted his attorney objected, saying, ''He may show how many times, but may not inquire further.''

Section 4-711, *supra,* is declaratory of the common law. *State v. Ede,* 167 Or. 640, 117 P. (2d) 235. It is proper to prove that the defendant has been convicted of several offenses. *State v. Newlin,* 84 Or. 323, 326, 165 P. 225, and authorities therein cited; *State v. Goodloe,* 144 Or. 193, 199, 24 P. (2d) 28; 70 C. J., Witnesses, § 1056, p. 854. The names and nature of the crimes of which he has been convicted may be

shown, 70 C. J., ibid. § 1053; *State v. Gilbert,* 138 Or. 291, 4 P. (2d) 923, and also the places where they were committed. 70 C. J., ibid. § 1055.

■ No error was committed by the court in overruling defendant's objections to the foregoing testimony.

After the defendant had testified on cross-examination as to his former convictions and before the state had offered in evidence certified copies thereof, defendant was further questioned by his counsel on redirect examination but during such examination his former convictions were not mentioned. The state, in order to show the nature of the crimes for which defendant had previously been convicted, the number thereof, and the places where they had been committed, offered Exhibits "S", "T", and "U", and they were admitted over defendant's objection.

■ It will be noted that the defendant mentioned in two of these certified copies is referred to as "Fred Wilson" instead of Forrest Wilson. No objection, however, was made at the time of the admission of these exhibits on the ground that the Fred Wilson, therein mentioned, was not the same individual as the defendant in the instant case. There is evidence tending to show that defendant Wilson was known in Texas as Fred Wilson. There is also a recital in the certified copy of the judgment from California that defendant therein named, Forrest E. Wilson, had admitted a prior conviction of robbery in the district court of the state of Texas, Dallas county, on or about August 24, 1940. Defendant's contention, made for the first time in this court, that the certified copies of judgments of conviction from Texas were inadmissible because the convict therein mentioned is referred to as Fred Wilson, and not as Forrest Wilson, cannot

be considered here for the reason that no such objection was made to their admission in the circuit court.

■ Defendant, in his examination which we have referred to, stated that he had been convicted in Texas once and that the crime of which he had been convicted was larceny. It therefore became necessary for the state, in order to prove the number of times the defendant had been convicted of a felony in Texas and the nature of the crimes of which he had been convicted in that state and in California, to introduce the certified copies of the judgments of conviction.

In *State v. Ede*, supra, the defendant objected to the admission of a certified copy of the record of a judgment showing that he had been convicted of a crime on the ground that, since on cross-examination he had admitted that he had been convicted of a crime, the subsequent admission of the record was error. Answering that contention the court said:

"The bill of exceptions, however, shows that the defendant, when asked if he had been convicted of a crime, answered: 'Yes, I had a fight in Portland and was paroled, I got a thirty-day sentence and was paroled'. * * * Hence, so far as the record shows, the only admission made by the defendant was that he had had a fight in Portland and had been paroled from a thirty-day sentence. The document introduced, however, shows that defendant's conviction was not for a fight in Portland but was for the crime of assault with a dangerous weapon committed at another time, for which he had been sentenced to serve not thirty days but a period of three months. This was an entirely different offense from that for which the defendant admitted he was convicted and, hence, it was not error for the court to permit the state to introduce this record in evidence, * * *."

Under the facts as they appear in the case, no error was committed in admitting in evidence the certified copies of prior convictions.

Numerous other assignments of error are discussed in appellant's brief. Those assignments relate to matters concerning the discretionary power of the trial court and, inasmuch as the questions presented by those assignments will probably not arise on the re-trial of the cause, we deem it unnecessary to discuss them.

Because of the error of the circuit court in refusing to instruct the jury, as requested by the defendant, on the different degrees of homicide, the judgment appealed from is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Winslow, former Justice pro tem., did not participate in this opinion.